**B & L FARMS CO. and May Spach, Edwin L. Hubbard and John Nicholas, as Trustees in Bankruptcy for B & L Farms, Co., Plaintiffs,**

v.

**The UNITED STATES of America, and Laurie W. Tomlinson, Defendants.**

Civ. No. 63–323.

United States District Court
S. D. Florida,
Miami Division.

June 25, 1964.

On Rehearing Feb. 19, 1965.

Edwin L. Hubbard, Coral Gables, Fla., W. G. Ward, Miami, Fla., for plaintiffs.

Wm. A. Meadows, Jr., U. S. Atty., Lavinia L. Redd, Asst. U. S. Atty., Miami, Fla., for defendants.

FULTON, District Judge.

This is a tax refund suit whereby the plaintiffs seek to recover income taxes in the amount of $162,538.73, which were paid for the taxpayer's fiscal year ending July 31, 1956.

Plaintiffs contend that the taxpayer suffered a net operating loss for the fiscal year ending July 31, 1959, which loss was sufficient in amount to justify the claimed refund. Plaintiffs rely on the "carry-back" provisions of Section 172 of the Internal Revenue Code of 1954.

The case was submitted on the pleadings and the briefs of counsel. The parties agreed to an extensive stipulation of facts, which stipulation is incorporated herein by reference. The following is a brief summary of the pertinent facts.

Plaintiff, B & L Farms Co., is a corporation which was formerly engaged in a farming business in Dade County, Florida, and which incurred and paid federal income taxes for its fiscal year ending July 31, 1956. On August 1, 1958, the company filed a petition in this Court for a Plan of Arrangement under Chapter XI of the Bankruptcy Act. The attempt to work out the arrangement was unsuccessful, however, and the company was adjudicated to be a bankrupt in this Court on June 26, 1959, upon petition of several of the creditors. The adjudication of bankruptcy occurred approximately five weeks prior to the end of the company's 1959 fiscal year. May Spach, Edwin L. Hubbard and John Nicholas were appointed as trustees in bankruptcy

for the company. They continue to serve in this capacity.

B & L Farms Co. was incorporated in 1949. From that date until said bankruptcy, the company engaged in the production and packing of tomatoes and other produce. For tax purposes, the company kept its books and reported its income on a cash receipts and disbursements basis. It calculated and reported its income on a fiscal year basis, commencing August 1st of each year and ending on July 31st of the next year.

The company prospered through its 1956 fiscal year, but thereafter it encountered difficulties caused by adverse weather conditions. Upon adjudication in bankrupcty, the farming operations of the company terminated. The company's packing house and machinery were not operated by the trustees, but these assets were subsequently sold by the trustees, in a package deal with other property.

During the 1959 fiscal year, prior to bankruptcy, the company incurred an indebtedness of $2,459,618 in the purchase of fertilizer, insecticides and other items necessary for its farming operations. This trade account indebtedness remained unpaid at the time of the bankruptcy adjudication. Claims based on this indebtedness were subsequently filed in the bankruptcy proceedings. A considerable portion of such claims were paid by the trustees, but such payment to these creditors did not occur until after the end of B & L Farms Co.'s 1959 fiscal year.

It is uncontroverted that the company did suffer a considerable net operating loss in the 1959 fiscal year, even apart from any of the items in dispute in this lawsuit. In fact, the sum of $162,538.73, which the company paid as federal income taxes for the 1956 fiscal year, is the adjusted tax payment for that year, computed after applying a net operating loss "carry-back" from 1959 which the government conceded. What the present case involves, therefore, is the contention by plaintiffs that the law permits a still larger net operating loss computation for the 1959 fiscal year

Plaintiffs contend that a larger net operating loss for fiscal year 1959 can be established, because of the transfer of all corporate assets to the trustees on June 26, 1959, by any one of the following deductions:

(1) Deduction under 26 U.S.C. § 162 for business expenses due to the trade account indebtedness incurred during fiscal year 1959.

(2) Deduction under 26 U.S.C. § 165 for a business loss because of the divestiture of the bankrupt's assets to the trustees.

(3) Deduction under 26 U.S.C. § 167 for a sudden obsolescence loss because of the abnormal retirement of the depreciable packing house and machinery at the time of the bankruptcy.

It is conceded that any one of these deductions, if valid, would be sufficient in amount to permit the refund claimed in this case.

CLAIM UNDER SECTION 162

Plaintiffs' claim for a deduction for business expenses under 26 U.S.C. § 162 raises the immediate problem that the creditors for such expenses did not receive actual payment until after the close of the company's 1959 fiscal year. This deduction provision, Section 162, provides in part:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

A general rule for determining appropriate tax years is stated in 26 U.S.C. § 461, which provides in part:

"The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."

Since the company was on the cash basis method of reporting, the government argues that the company can not claim a Section 162 deduction, under the applica-

ble statutes, because the claimed business expenses were not "paid" during the 1959 fiscal year.

The plaintiffs contend that the business expenses were properly deductible in fiscal 1959 because the adjudication of bankruptcy occurred in that year and because the concurrent divestiture of the bankrupt's assets for distribution to the creditors constituted "payment" on account of such deductible debts at the time of such divestiture.

■ Plaintiffs' theory of payment by divestiture in bankruptcy can not be sustained under the law. It is a general principle of tax law that a deduction must be established by the express provisions of the statute. White v. United States, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172 (1938). In the present case, Section 162 uses the word "paid". It has been held in a similar context that the word "paid" means "to liquidate a liability in cash." P. G. Lake, Inc. v. Commissioner, 148 F. 2d 898 (5th Cir. 1945). This definition can be broadened to include "cash or its equivalent"; but that is as far as the courts will go. Helvering v. Price, 309 U.S. 409, 60 S.Ct. 673, 84 L.Ed. 836 (1940). The unfortunate fact for plaintiffs in the present case is that the creditors of the taxpayer simply did not receive actual payment for their claims, in the strict sense required by the law, during the 1959 fiscal year.

■ It is true that payees receiving payment by check are deemed to have been "paid" for tax deduction purposes, even though the actual cash may not be received until the following tax year. 2 Mertens, Section 12.54. However, a check is a specific negotiable claim which is treated in the business world as the equivalent of cash. This is far different from the claims which the creditors of B & L Farms Co., had upon the adjudication in bankruptcy.

Plaintiffs recognize that they can not save their claim under Section 162 by any open theory of "constructive payment." The concept of constructive payment has been applied occasionally in the

check-payment cases, but it has received little favor elsewhere, because of the reluctance of the courts to expand the legislatively-declared scope of such deductions. 2 Mertens Sections 10.18, 12.53–12.59; P. G. Lake v. Commissioner, supra; Vander Poel v. Commissioner, 8 T.C. 407 (1947).

■ Plaintiffs deny that they need to rely on a "constructive payment" theory; they assert instead that they can show actual payment by virtue of the status of the bankruptcy trustees in this matter. Plaintiffs take the position that the unconditional transfer of assets to the trustees was in effect payment to the creditors at that time. This position is apparently based on the theory that the trustees were to all intents and purposes merely collection agents for the creditors. This contention is obviously untenable because bankruptcy trustees do not represent the creditors alone. They must protect the interests of the bankrupt and provide for the payment of administrative costs. During the 1959 fiscal year, which is the crucial year in the present case, the trustees did not have any fixed duty to pay over any specific amounts to any particular creditors.

Plaintiffs cite the case of Stanton v. Commissioner, 36 B.T.A. 112 (1937), which has some language which can be construed to support plaintiffs' position. However, the Stanton case involved a transfer to non-bankruptcy trustees, who actually paid the creditors in the year for which the tax deduction was allowed. Regardless of its language, therefore, the holding in Stanton is of no help to plaintiffs.

While no bankruptcy cases have been found squarely on point on the "payment" issue, there are analogous cases which support the denial of the Section 162 deduction. It has been held that an individual who transfers business assets to a corporation is not entitled to claim "payment" of his deductible business liabilities at the time of such transfer, even though the transferee assumed such liabilities and subsequently did pay them. Arthur L. Kniffen, 39 T.C. 553 (1962);

Doggett v. Commissioner, 275 F.2d 823 (4th Cir. 1960); Citizens Nat. Trust & Savings Bank of Los Angeles v. Welch, 119 F.2d 717 (9th Cir. 1941). The same result should follow in the present case.

## CLAIM UNDER SECTION 165

██ Plaintiffs anticipated that Section 162 might be restrictively interpreted on the payment issue, and they claim "in the alternative" that they still have a loss deduction under Section 165. They contend that this "loss" is in the amount of the company's deductible trade expenses, and that such loss was "finalized" by the transfer of the corporate assets to the trustees in bankruptcy. Section 165 provides in part:

> "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

It is difficult to see how plaintiffs' claim under Section 165 is in any essential way different from its claim under Section 162. In their brief, Plaintiffs state their position with respect to this alternative claim as follows:

> "If it is construed that the transfer of assets to the trustee in bankruptcy does not constitute payment of the deductible debts, it nevertheless is a loss deductible under Section 165 because the taxpayer was divested of and lost its assets (including a large amount of cash) for the purpose of paying the deductible debts * * *. We wish to point out that we limit our loss to the amount of the claims that are deductible for income tax purposes * * *."

Plaintiffs are obviously using the word "loss" in a very general way, as they discuss their alternative claim under Section 165. They make reference to the catastrophic business losses that the company suffered prior to bankruptcy. Among other things, they state:

> "Bankruptcy has nothing to do with the creation of our loss. It existed prior to bankruptcy. The divestiture of the taxpayer's assets merely finalized the deductibility of the loss."

However, it still remains unclear just what kind of loss *relevant to Section 165* existed in this case, and how the alleged loss differs from the previously discussed business expense deduction, which is claimed under Section 162.

Plaintiffs apparently are confusing the concept of "loss", as provided for in Section 165, with the completely different concept of "net operating loss", as provided for in Section 172.

Both parties hereto have conceded that there was a net operating loss, under Section 172, for the fiscal year ending July 31, 1959. This net operating loss for 1959 could be, and was, carried back to reduce the tax which was paid for the fiscal year ending July 31, 1956. It is important to note that we have already decided that trade expenses which were not "paid" in the 1959 fiscal year can not serve as deductions for purposes of computing the net operating loss for that year.

It is true that a "loss" under Section 165, which occurred in the fiscal year ending July 31, 1959, can be used in computing the net operating loss for that year. But it is obvious that a Section 165 loss can be established only if it is shown that some specific, identifiable loss of assets, other than the overall net operating loss, occurred to the taxpayer during the tax year. It suffices to say that no such showing was made on the record in the present case.

Plaintiffs cite Stuart v. Commissioner, 38 B.T.A. 1147 (1938), in support of their position. However, the Stuart case is merely the exception that proves the rule. In Stuart, the taxpayer did have a specific deductible loss, arising from a court judgment against him. A broader reading of Stuart, in terms of "net income" and "net loss" was expressly rejected in Parkford v. Commissioner, 45 B.T.A. 461, aff'd, 133 F.2d 249 (9th Cir. 1943).

## CLAIM UNDER SECTION 167

██ Plaintiffs' final alternative is a claim under Section 167 for a sudden ob-

solescence loss on the packing house and machinery which were turned over to the trustees upon bankruptcy. Since these assets were *depreciable* business property, any deductible loss on their account must be determined under Section 167 rather than Section 165. See Treasury Regulations, Section 1.165–2 (filed June 11, 1956).

Section 167 provides in part as follows:

"There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—of property used in the trade or business, or— of property held for the production of income. * * * "

The pertinent regulation is section 1.167(a)–8 (filed June 11, 1956), and it provides in part:

"*Section 1.167(a)–8 Retirements.*

"(a) Gains and losses on retirements. For the purposes of this section the term 'retirement' means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation. * * *

"(3) Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap

account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if— * * * (i) The retirement is an abnormal retirement, * * *.

* * * * * *

"For the purpose of this section the determination of whether a retirement is normal or abnormal shall be made in the light of all the facts and circumstances. * * *

* * * * * *

"a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circumstances, as, for example, when the asset has been damaged by casualty or has lost its usefulness suddenly as the result of extraordinary obsolescence."

If plaintiffs are to successfully maintain their claim for a sudden obsolescence loss in this case, they must do so on the basis of the facts set out in the pretrial stipulation. That stipulation contains the following relevant statements:

* * * * * *

"The unrecovered depreciable costs of the packing house and machinery which were assets of the bankrupt at the time of adjudication on June 26, 1959, were * * * $720,735.00."

* * * * * *

"Upon adjudication, the farming operations of B & L FARMS CO., terminated; the packing house and machinery were not operated by the trustees and were subsequently sold in a package deal with other property."

* * * * * *

"The salvage value of the packing house and machinery * * * on June 26, 1959, did not exceed * * * $264,000.00."

* * * * * *

From these facts, plaintiffs conclude that it is established that the company suffered an economic loss on June 26, 1959, of $456,735.00, such sum being the difference between the unrecovered costs and the salvage value on the packing house and machinery. They further contend that this loss resulted from the permanent retirement of these assets from the business upon bankruptcy. It is claimed that this retirement was abnormal in that the cause was not contemplated in setting the applicable depreciation rates; and that, therefore, the loss clearly comes within the quoted provisions of section 1.167(a)–8 of the regulations and is deductible.

The Court can not agree with the ultimate conclusion which Plaintiffs reach. Without deciding whether the government is correct in its position that Section 167 applies only when an ongoing business is involved, the Court finds that the plaintiffs have not met their burden of showing as a matter of fact that they come within Section 167.

The Court interprets Section 167 and its regulation as requiring not only that an abnormal retirement of a depreciable asset be shown, but also that it was sudden obsolescence which *caused* the retirement of such asset.

Nothing in the stipulated facts indicates that any functional or economic obsolescence of the packing house and machinery caused their retirement. On the contrary, it appears that adverse weather conditions caused the financial trouble which led to the bankruptcy and the retirement of the assets.

Plaintiffs have cited no cases construing Section 167 in the manner which they seek to have adopted. They do contend that Section 1.167(a)–8 of the regulations nowhere explicitly requires that any particular type of causation is required with regard to retirement of an asset. However, obsolescence as the activating factor certainly is at least implicit throughout the regulation. It could hardly be otherwise in a regulation which is based on a statute granting a deduction that is limited to "exhaustion" and "wear and tear" and "obsolescence" of business assets.

## CONCLUSION

Based on the foregoing discussion, it is the opinion of the Court that plaintiffs are not entitled to recover on any of the three theories advanced. This ruling makes it unnecessary to consider the possible conflict between plaintiffs as to which one is entitled to the refund. There is authority for the proposition that the bankrupt, and not the trustee in bankruptcy, is entitled to a refund based on the carryback of a net operating loss, where the bankrupt's pertinent tax year did not end until after the adjudication of bankruptcy. Fournier v. Rosenblum, 318 F.2d 525 (1st Cir. 1963); In re Sussman, 289 F.2d 76 (3rd Cir. 1961). There is also authority to the contrary. In Matter of Segal, 221 F. Supp. 282 (N.D.Tex.1963). See also Palmer v. Travelers Ins. Co., 319 F.2d 296 (5th Cir. 1963). Since this issue was not raised or briefed by the parties, and since it need not be decided in view of the denial of recovery, the Court expresses no opinion thereon.

Judgment shall be entered for the defendant, United States of America. A separate order shall be entered dismissing Laurie W. Tomlinson as a defendant, by agreement of the parties in the pretrial stipulation.

This opinion shall serve as findings of fact and conclusions of law under Rule 52, Fed.Rules of Civ.Procedure.

## ON REHEARING

Subsequent to the filing of the opinion and judgment heretofore entered in this cause, the plaintiffs filed their motion "for a new trial and a rehearing, and to alter, amend or vacate" said opinion and judgment.

The Court construed the motion as a petition for rehearing and a rehearing was granted. Both parties appeared before the Court in an extended oral argument upon said rehearing.

Plaintiffs correctly note that there are two errors in the opinion previously entered by the Court. In the seventh paragraph of the opinion, on page 2 thereof, the year in which a substantial trade account indebtedness was incurred was given as "the 1959 fiscal year" when the correct reference should have been to the 1958 fiscal year. Also, on page 412 of the opinion, the effective date of Treas. Regulations, Section 1.165–2, is given as "June 11, 1956", whereas the correct date is actually January 15, 1960. The conclusion reached by the Court in its original opinion is not affected by these inaccuracies in dates; but said errors are noted and are hereby deemed to be corrected.

In the argument on rehearing, plaintiffs strongly urged that the Court had not adequately considered or distinguished the case of Stuart v. Commissioner, 38 B.T.A. 1147. The Court accordingly has reread and carefully reconsidered this case.

The Stuart case was decided in 1938. The Board of Tax Appeals held that a cash basis taxpayer, who had a court judgment entered against him in 1933 and who went into bankruptcy in 1934, was entitled to a business loss deduction for the 1934 tax year in the amount of said judgment, even though the judgment creditor was not actually paid by the trustee in bankruptcy in 1934.

Plaintiffs argue that the Stuart case supports their contentions in the present case, upon either their "payment" theory under section 162 or their "loss" theory under section 161 of the Internal Revenue Code of 1954.

To the extent that Stuart permitted a loss to be considered as being "sustained" by a cash basis taxpayer in a year other than the year of the actual payment to the judgment creditor, said Stuart case constitutes some authority, by analogy, for the proposition that a trade expense might be considered as being "paid" for purposes of section 162 even though not actually paid over to the creditor during the tax year for which a deduction is sought. However, the Court is of the opinion that the Stuart case is directly contrary to the overwhelming weight of authority on this point, as previously cited by the Court, and the Court declines to follow the Stuart case in this regard.

As for the contention that Stuart is authority for a loss deduction under section 165, the Court can only reiterate that the present case does not involve a specific, deductible loss, as was true in Stuart. It seems abundantly clear from the Stuart opinion itself (38 B.T.A. at p. 1151), and from the subsequent interpretation of Stuart in Parkford v. Commissioner, 45 B.T.A. 461, aff'd. 133 F.2d 249, 146 A.L.R. 57 (9th Cir. 1943), that Stuart is no authority whatsoever for the proposition that the turning over of assets to a trustee in bankruptcy in any way constitutes a "loss" in the tax sense. The Court remains of the opinion that plaintiffs do not have a business loss deduction under section 165 for the simple reason that plaintiff B & L Farms did not sustain a "loss" within the intent of the tax statute when it turned over its assets to the trustee in bankruptcy.

Moreover, this conclusion applies equally as well to plaintiffs' alternative claim upon rehearing that they have a specific deduction under section 165 because of the "sudden loss of usefulness" and the "discarding" of their plant and machinery when those assets were turned over to the trustee. It is true, as urged by plaintiffs, that Regulation 39:23(e) of the 1939 Code provided for a deduction where there has been a "sudden loss of usefulness". Plaintiffs say that "the usefulness of the packing house and machinery in its business suddenly terminated" when the taxpayer turned those assets over to the trustee. However, it seems evident that such a conclusion is not within the meaning of the regulation or the statute. The regulation is captioned "Loss of Useful Value" and surely was intended to apply only in those cases where some objective loss of value has occurred, and which loss of value has caused the discarding of the property. The regulation

should not be interpreted to permit a "loss" deduction simply because the taxpayer has physically given up its property.

The question is always present under section 165 as to what was obtained in return for giving up any property. In the present case, liquidation of liabilities was obtained by the disposition of the property by the bankruptcy trustee. This was not a "loss" and no deduction is authorized.

 The plaintiffs have also emphasized on rehearing their contention that the Court has not given adequate weight to the general principle that "substance, not form, should govern" in applying the revenue laws. In the sense that evasive devices or hypertechnical interpretations should not be permitted to thwart the plain intent of a tax statute, the general principle is recognized and approved. However, such principle is not a general license to suspend or ignore major provisions of the Internal Revenue Code simply because their clear application in a particular case results in a heavier tax liability than would be in the case if the facts were only slightly different.

For example, the Code provides sharply different capital gains treatment depending on whether property has been held six months or more. As to two taxpayers selling identical property only a few days apart, one before and one after the six month date, it must seem harsh and a matter of "form, not substance" that they should be treated so differently. Yet that is what the Code intends and that is how it must be interpreted.

Similarly, the principle of taxation in terms of an *annual* accounting period has always been a prime feature of the Internal Revenue Code. Woolford Realty Co. v. Rose, 286 U.S. 319, 52 S.Ct. 568, 76 L.Ed. 1128 (1932); Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337 (1938). As stated by the Supreme Court in the Woolford case:

"The general principle underlying the income tax statutes, ever since the adoption of the Sixteenth Amendment, has been the computation of gains and losses on the basis of an annual accounting for the transactions of the year. (citation) A taxpayer who seeks an allowance for losses suffered in an earlier year must be able to point to a specific provision of the statute permitting the deduction, and must bring himself within its terms. Unless he can do this, the operations of the current year must be the measure of his burden." (286 U.S. at p. 326, 52 S.Ct. at p. 569)

In the Heiner case, the Court held that this principle was applicable to require the showing of profits in a particular tax year, even though the taxpayer (a liquor business affected by Prohibition) was being liquidated over a period of years and ultimately might show a loss on the business venture taken as a whole.

It follows that, if the annual tax year is an important feature of the income tax, then the method of accounting to determine what is included and excluded from such tax year is also important and must be consistently applied. Section 446 of the Code provides for the various methods of accounting and requires the Commissioner's consent to any change in such methods. It is further provided that permission to change will not be granted unless the taxpayer agrees to the various terms, conditions, and adjustments under which the change will be effected. Regulation 1.446-1(e). See also section 481 of the Code.

 In the present case, the B & L Farms Company was on the cash-basis method of accounting. As was held in the original opinion, a cash-basis taxpayer can not claim deductible expenses unless they were "paid" during the applicable tax year, in the sense of having been actually paid to the creditors involved. For the Court nevertheless to conclude that the expenses were paid "in substance but not in form" would really amount to the same thing as permitting the taxpayer to "accrue" the expenses. This should not be permitted

in view of the importance of the annual tax year and the required consistency of accounting pertaining thereto. If expenses may thus be "accrued" because of the unfortunate event of bankruptcy, then accrued receivables should also be taken into account. Moreover, to do complete "equity" the Court should consider what benefits the taxpayer may have received from its cash-basis of accounting during its earlier years of operation. It requires no further enumeration of the various "equitable" factors to indicate the necessity and propriety of interpreting the tax laws in question, as they are presently drafted, to preclude any such roving investigation by the Court.

### ORDER

For the above reasons, the prior opinion and judgment is hereby reaffirmed upon rehearing. To the extent that plaintiffs have moved for a new trial, a contention not pressed by plaintiffs in brief or argument, said motion is hereby denied.