*Decisions will be entered under Rule 50.*

HOMER A. MARTIN, JR., AND ALMA M. MARTIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4028–69SC. Filed September 14, 1971.

Homer A. Martin, Jr., and Alma M. Martin, pro se.
*W. Read Smith* and *Daniel A. Taylor, Jr.*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1966 and 1967 in the amounts of $438.01 and $693.20, respectively. The sole issue for decision is whether in 1966 and 1967 petitioners are entitled to deductions under section 172[1] for a net operating loss carryover from 1965 in excess of the amounts allowed by respondent.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise specified.

Homer A. Martin, Jr. (hereinafter referred to as Homer), and Alma M. Martin (hereinafter Alma), husband and wife, were residents of Victoria, Tex., at the time they filed their petition. They filed joint Federal income tax returns for 1966 and 1967 with the district director of internal revenue, Austin, Tex.

For several years prior to May 14, 1965, petitioners operated a business known as Village Music Shop. Their joint income tax returns for 1963 and 1964 indicate that the operations of the business resulted in substantial net operating losses during those years. For the period in 1965 prior to May 14, the expenses of the business exceeded the revenue by $5,111.28.

On May 14, 1965, Homer filed a debtor's petition in the U.S. District Court for the Southern District of Texas, praying that he be adjudged a bankrupt. His petition recited that he owed a total amount of $15,796.45, consisting of: $198.11 to creditors given priority by the Bankruptcy Act; $7,400 to secured creditors; and $8,198.34 to unsecured creditors, including debts of $5,966.62 for the purchase of merchandise. Without regard to property claimed to be exempt, the petition listed assets in the total amount of $10,561.51, including stock in trade in the amount of $4,468. He received a discharge in bankruptcy on June 13, 1966.

Homer was employed as a schoolteacher during 1965 and until the spring of 1966, when he accepted employment as an engineer with Surgical Engineering & Research. This latter employment continued through 1967. During 1965, he earned $4,642; of this amount, $1,563 was earned before he filed his petition in bankruptcy.

After the transfer of the assets to the trustee in bankruptcy, Alma engaged in the real estate and insurance business under the trade name of Busy Bee Services. Her net earnings in this business during 1965 amounted to $377.79.

In their joint income tax return for 1965, petitioners reported as income Homer's salary of $4,642 and a loss of $7,715, computed by netting the claimed loss ($7,432) from the Village Music Shop [2] with the reported income from Busy Bee Services ($717.29) [3] and by deducting $1,000 as a long-term "capital loss." They also claimed personal exemption deductions of $2,400 and itemized deductions of $1,739. [4]

---

[2] Respondent determined adjustments to this claimed loss, but the petition does not place them in dispute. The loss as computed by respondent is $5,111.28.

[3] Respondent determined adjustments to this reported income figure, but in the petition they were not assigned as errors. The adjusted income is $377.79.

[4] Respondent determined adjustments to these claimed deductions, but in the petition such adjustments were not assigned as errors. The adjusted total amount of itemized deductions is $1,474.73.

The capital loss deduction was derived from the following entry in the return:

Operated Village Music Shop for 9 years.
Bankruptcy declared May, 1965. Lost all:

| | |
|---|---:|
| Inventory | $4,500 |
| Cash | 58 |
| Automobiles | 2,766 |
| Fixtures | 2,145 |
| Accounts receivable | 840 |
| | 10,309 |

In their joint income tax returns for 1966 and 1967, petitioners deducted $1,000 each year. These deductions, which represented a carryover of a part of the $10,309 entry in the 1965 return, were identified in the 1966 return as "Loss for 1965" and in the 1967 return as "Loss carried from 1965."

In determining the deficiencies for 1966 and 1967, respondent disallowed the $1,000 deductions, described above, for both years; he recomputed petitioners' taxable income, i.e., loss, for 1965, determining it to be $91.49, and allowed a net operating loss carryover from that year to 1966 in that amount. He allowed no net operating loss for 1967.

## OPINION

Petitioners alleged in an amendment to their petition, and here contend, that respondent erred in computing their net operating loss carryover from 1965 in two respects: (1) By failing to reduce their postbankruptcy income by their personal exemption and itemized nonbusiness deductions before subtracting such income from the loss generated by their prebankruptcy trade or business, and (2) by denying any deduction for the cost of the inventory of merchandise which they turned over to the trustee shortly after they filed their bankruptcy petition.

Petitioners' first contention must be viewed in the light of the provisions of section 172 which allow the carryover and carryback of net operating losses attributable to business endeavors. The provisions are designed to avoid requiring a business with alternating profits and losses from paying higher taxes "over a period of years than a business with stable profits, although the average income of the two firms is equal." H. Rept. No. 855, 76th Cong., 1st Sess. (1939), 1939-2 C.B. 510. This objective is accomplished by allowing a business "to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." *Libson Shops, Inc.* v. *Koehler,* 353 U.S. 382, 386 (1957).

Consistent with these broad objectives, section 172 lays down specific rules for computing the net operating loss deduction. Subsection (c) defines a net operating loss to mean "the excess of the deductions allowed * * *over the gross income," but the subsection further specifies that "Such excess shall be computed with the modifications specified in subsection (d)." Several modifications are required by subsection (d), including one (sec. 172(d)(3)) designed to assure that "No deduction shall be allowed under section 151 (relating to personal exemptions)," and another (sec. 172(d)(4)) to assure that, in the case of a taxpayer other than a corporation, the deductions allowable "which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business." Quite clearly, these provisions require the elimination of personal exemption and nonbusiness deductions as factors in the computation of the net operating loss.

In calculating petitioners' net operating loss for 1965, respondent started with that year's "adjusted taxable income," i.e., a loss, which took into account petitioners' business income and deductions as well as their personal exemption and nonbusiness deductions. Under the provisions of section 172(d)(4), referred to above, no deduction was allowable for the nonbusiness expenses, because petitioners had no nonbusiness income. Therefore, since deduction had been allowed for the personal exemptions and nonbusiness expenses in computing the adjusted taxable income (loss), it was necessary to eliminate their effect as required by section 172(d)(3) and (4). To do this, respondent added the total amount of the personal exemption and nonbusiness deductions to the adjusted taxable income (loss). The resulting net operating loss from all of petitioners' business endeavors during 1965 was determined to be $91.49, and respondent allowed this amount as a deduction from petitioners' 1966 income.[5]

Petitioners contend that respondent's method for computing the net operating loss is erroneous. They urge that the year 1965 should be viewed as involving two distinct periods, one prior to the bankruptcy and the other after it, and that the income or loss for each period should be computed separately. The net operating loss for the prebankruptcy period would be computed by subtracting the loss from Village Music Shop from Homer's teaching salary for that period; the result would reflect the amount of the net operating loss subject to carryover to later periods. The computation of the profit for the postbankruptcy period in 1965 would take into account Homer's

---

[5] In *Segal* v. *Rochelle*, 382 U.S. 375 (1966), the Supreme Court pretermitted the question whether a prebankruptcy loss will support a net operating loss carryover deduction by the bankrupt. Respondent has not raised that issue in this case.

teaching salary for that part of the year and Alma's income from Busy Bee Services. Petitioners would reduce this profit by their personal exemption and nonbusiness deductions; they would further reduce the resulting net income by an equal amount of the net operating loss for the prebankruptcy period in 1965, and the remainder of the loss would be carried over to 1966.

Petitioners err, first, in viewing 1965 as involving two separate periods. The taxable year cannot be segmented into prebankruptcy and postbankruptcy periods. See *Stoller* v. *United States*, 320 F. 2d 340 (Ct. Cl. 1963) ; *Selma Heasley*, 45 T.C. 448, 461–462 (1966). Nor can petitioners' various business activities be segregated for the purpose of computing the net operating loss. Where a taxpayer engages in several businesses during a taxable year, the income and expenses of all such endeavors are to be aggregated in determining the amount, if any, of the net operating loss. *Roberts* v. *Commissioner*, 258 F. 2d 634 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court; *Pierce* v. *United States*, 254 F. 2d 885 (C.A. 9, 1958). It is the *net* operating loss from *all* of a taxpayer's trades and businesses during the entire taxable year, rather than the losses of each of them independently, which is the subject of the net operating loss carryover.

Since the taxable year 1965 must be viewed as a whole, and all business income for the year must be aggregated, petitioners' method of computing the net operating loss is erroneous. Under their method ,the prebankruptcy loss would be reduced only by the amount of the excess of the postbankruptcy business net income over the personal exemption and nonbusiness deductions. The effect of this method is to allow petitioners the benefit of their personal exemption and nonbusiness deductions in computing their 1965 net operating loss in violation of section 172(d) (3) and (4). Respondent's method of computation, on the other hand, aggregates all of petitioners' business income and expenses for 1965 and allows as a net operating loss only the excess of the total business expenditures over the total business income; it is consistent with the statute.

Nor do we think respondent erred in applying his method by failing to allow a deduction for the cost of the inventory items turned over to the bankruptcy trustee. Although the facts on this issue are quite meager, it appears that petitioners prepared their returns on a cash receipts and disbursements basis except that they accounted for inventory on an accrual basis. In other words, in computing the cost of goods sold for a taxable period, petitioners apparently added the cost of the opening inventory to inventory purchases and then subtracted the closing inventory.[6] As of the date of bankruptcy, peti-

[6] The petition in bankruptcy reflects a substantially larger amount of indebtedness for merchandise ($5,966.62) than the cost of the inventory turned over to the trustee ($4,468).

tioners had on hand inventory with a value of about $4,500, all of which was turned over to the trustee.

Petitioners emphasize that the inventory "was seized by the Court without compensation" and that their closing inventory was reduced thereby. While an inventory reduction ordinarily results in the accrual of the cost attributable thereto, the surrender of inventory items to a trustee in bankruptcy does not cause the kind of reduction that will support such an accrual. Such a surrender is a nontaxable transaction in that the bankrupt realizes no gain from the transfer even though, as in the instant case, the debts on which the trustee will apply the liquidation proceeds and from which the bankrupt will ultimately be discharged exceed the bankrupt's basis in the assets. Indeed, ordinarily the bankrupt realizes no gain from the discharge of his indebtedness. Sec. 1.61–12(b), Income Tax Regs. Consistent with this treatment of the transaction as nontaxable is the rule that the bankrupt estate, a separate taxable entity, takes the bankrupt's basis for the transferred assets, thereby reducing the taxable income received by the trustee on the disposition of such assets. *In re Loehr*, 98 F. Supp. 402 (E.D. Wis. 1950); see also *Norris Bloomfield*, 52 T.C. 745, 750 (1969); Krause & Kapiloff, "The Bankrupt Estate, Taxable Income and the Trustee in Bankruptcy," 34 Ford. L. Rev. 401, 407 (1966); Rev. Rul. 68–48, 1968–1 C.B. 301.

In other nontaxable transfers of inventory, the opening inventory is adjusted in order to reflect the removal of the transferred assets and the costs pertaining thereto. See Rev. Rul. 55–138, 1955–1 C.B. 223. The same principle is applicable here; petitioners' opening inventory must be adjusted for the items delivered to the trustee, and when this is done no accrual results. Respondent, therefore, in computing the 1965 net operating loss for carryover purposes, did not err in denying petitioners a deduction for the cost of the inventory delivered to the trustee.

Moreover, the rule is settled that a deductible loss under section 165[7] is not sustained when a taxpayer delivers his assets to a trustee in bankruptcy. In *Parkford* v. *Commissioner*, 133 F.2d 249 (C.A. 9, 1943), affirming 45 B.T.A. 461 (1941), certiorari denied 319 U.S. 741 (1943), the court rejected a claim to a deduction for the cost of assets so delivered, stating (p. 251):

Taxpayer calls attention to no statute granting such a deduction; and since it is settled law that deductions are permitted as a matter of grace only, the

---

[7] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; \* \* \*

taxpayer must not only point to an appropriate statute but must bring himself squarely within its terms. * * * Moreover, the taxpayer sustained no loss. His debts appear to have exceeded his assets, and from his debts he was discharged. If he had voluntarily compromised his [debts] with his creditors by an assignment of his assets he could hardly assert a deductible loss. We perceive no reason why he may do so in the present circumstances.

See also *B & L Farms Co.* v. *United States*, 238 F. Supp. 407 (S.D. Fla. 1964), affirmed per curiam 368 F. 2d 571 (C.A. 5, 1966), certiorari denied 389 U.S. 835 (1967).

Finally, to support their argument that the disputed "inventory loss" is deductible, petitioners assert that a conferee revenue agent allowed the disputed deduction, and they were not informed of respondent's contrary conclusion until several months later. An argument to this effect was recently dealt with in *Sampson* v. *Commissioner*, 444 F. 2d 530 (C.A. 6, 1971), affirming a Memorandum Opinion of this Court, where the taxpayer claimed medical expense and charitable deductions, as follows (p. 531):

After disallowance of the deductions, the taxpayer husband met with a representative of the Appellate Division of the Internal Revenue Service in an attempt to settle his disputed tax liability. At this meeting an agreement was reached allowing all claimed deductions and taxpayer left the meeting with the understanding that a final settlement had been reached. However, the recommendations of the conferee of the Internal Revenue Service were rejected by his superiors and there were no further settlement negotiations.

Unfortunately, from the taxpayers' standpoint, an informal agreement such as was reached in this case is not binding and has no legal effect. *Botany Worsted Mills* v. *United States*, 278 U.S. 282 (1929); *Cleveland Trust Company* v. *United States*, 421 F. 2d 475 (6th Cir. 1970); *Country Gas Service* v. *United States*, 405 F. 2d 147 (1st Cir. 1969).

We must follow the same rule here.

To reflect other adjustments,[8]

*Decision will be entered under Rule 50.*

---

[8] On brief petitioners for the first time raised the issue of whether respondent properly disallowed certain claimed business expense deductions. This was not an issue raised by the pleadings, nor was it raised at the time of trial. Furthermore, no evidence was presented on this issue. Consequently, we have not considered it in arriving at our conclusions.