HERB M. GRIPENTROG and SUSAN E. GRIPENTROG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gripentrog v. Commissioner
Docket No. 3960-71.
United States Tax Court
T.C. Memo 1975-334; 1975 Tax Ct. Memo LEXIS 37; 34 T.C.M. (CCH) 1455; T.C.M. (RIA) 750334; November 10, 1975, Filed Herb M. Gripentrog, pro se. Michael W. Ford, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income taxes of $2,385.62 for 1964, $1,424.21 for 1967, and $2,226.16 for 1968. Respondent also determined negligence penalties of $71.21 for 1967 and $111.31 for 1968 under section 6653(a). [1] Petitioners accepted the determination of respondent on a number of questions, and so we decide only those issues not settled: (1) Whether Rib Mountain Cheese Corporation was a duly qualified Subchapter S corporation in 1967 so that corporate losses can pass through to Herb M. Gripentrog (hereinafter petitioner), a shareholder of that corporation; (2) whether petitioner is entitled to a net operating loss carryback from 1967 to 1964; (3) whether Rib Mountain was a duly qualified Subchapter S corporation in 1968 *39 so that corporate losses can pass through to petitioner; (4) whether petitioner is entitled to a loss of $1,000 in 1967 and 1968 for worthless stock in Dairyland Cold Storage, Inc.; (5) whether petitioner received $5,000 and $14,080.22 in salary in 1967 and 1968, respectively, from Rib Mountain Cheese Corporation; (6) whether respondent can assert a deficiency for 1968 although a revenue agent may have informally stated to petitioner, after partially completing the audit of his return, that he would recommend no changes in the tax; (7) whether petitioner is liable for negligence penalties determined under section 6653(a) for 1967 and 1968. GENERAL FINDINGS OF FACT Some facts were stipulated and are found accordingly. Petitioner and his wife, Susan E. Gripentrog, resided in Wausau, Wisconsin, when they filed their joint 1964, 1967, and 1968 income tax returns with the District Director of Internal Revenue, Milwaukee, Wisconsin, and when they filed their petition in this case. Issues 1-3. Corporate Election of Subchapter S Status
FINDINGS OF FACT During the years in question, *40 petitioner was president and shareholder of Rib Mountain Cheese Corporation (hereinafter Rib Mountain), a Wisconsin corporation which stores cheese. Rib Mountain incurred a net operating loss of $24,402.82 during 1967. Petitioner claimed this loss on his 1967 individual income tax return, but the loss more than offset his other income. He therefore executed, in February of 1968, an appropriate United States Treasury Department form, "Application For Tentative Carryback Adjustment," to carry back the excess net operating loss from his 1967 return to his 1964 return. In March of 1968, the District Director of Internal Revenue, Milwaukee, Wisconsin, notified petitioner that the excess 1967 loss would be applied to his 1964 liability and that he was entitled to a refund, pending audit of the proper returns. In 1968, Rib Mountain sustained a net operating loss of $9,146.40. Petitioner claimed this amount on his 1968 individual return, but it did not completely offset his other income and so he did not apply for a carryback adjustment. The Internal Revenue Service Center, Kansas City, Missouri, has custody and control of all copies of United States Treasury Department Form 2553, "Election *41 By Small Business Corporation As to taxable status under subchapter S of the Internal Revenue Code" (hereinafter Form 2553), filed by corporations located within the jurisdiction of the District Director of Internal Revenue, Milwaukee, Wisconsin, such as Rib Mountain. The Director of the Internal Revenue Service Center, Kansas City, Missouri, searched his records but has found no Form 2553 for Rib Mountain. James L. Gassner (hereinafter Gassner) began active practice as a certified public accountant in July of 1967 in Wausau, Wisconsin. He had been notified in February of that year that he had passed the examination which allowed his certification as a public accountant. Petitioner hired Gassner to do some work for him starting in December of 1967. Shortly after Gassner began work, still in December of 1967, petitioner requested and received from him four blank copies of Form 2553. Together Gassner and petitioner prepared a rough draft of Form 2553 at Gassner's office but did not complete it since they did not have answers to all questions asked. The evidence indicates that petitioner took the rough draft of Form 2553, along with the blank copies that he had received, to his home, *42 answered the remaining questions, and typed an original and two carbons, but dated them almost a year earlier to January 2, 1967. Even though petitioner backdated the form and obviously wanted Rib Mountain's losses to pass through to him, he did not file Form 2553 since the filing date for 1967 had long since passed when he and Gassner prepared the rough draft. Petitioner saved at least one of the carbons he prepared. There was no preparation of Form 2553 for Rib Mountain for 1967 and 1968 except that which occurred in late 1967 and early 1968 after petitioner had conferred with Gassner. OPINION The first issue is whether Rib Mountain was a duly qualified Subchapter S corporation in 1967 so that petitioner, a shareholder of that corporation, can claim corporate losses on his individual tax return. The second issue, which will be decided by the resolution of the first, is whether petitioner is entitled to a net operating loss carryback from 1967 to 1964. One purpose of the Subchapter S provisions is to permit shareholders of corporations which are sustaining losses to offset those corporate losses against their individual income from other sources. S. Rept. No. 1983, 85th Cong. *43 , 2d Sess. (1958), 1958-3 C.B. 922, 1009. Any loss greater than the other sources of income can be carried back to the individual shareholder's prior taxable years. Secs. 1374 and 172. Rib Mountain sustained a loss in 1967 and petitioner took advantage of the Subchapter S provisions by deducting this loss on his 1967 individual return. Since the loss more than offset his other sources of income, he carried back the excess to 1964. For petitioner to take advantage of the Subchapter S provisions, it was necessary that Rib Mountain properly elect Subchapter S status by filing Form 2553. Sec. 1372 and sec. 1.1372-2(a), Income Tax Regs. Respondent contends that Rib Mountain did not file this form and petitioner, of course, contends that it did. The Internal Revenue Service Center, Kansas City, Missouri, has custody and control of all copies of Form 2553 filed by corporations located within the jurisdiction of the District Director of Internal Revenue, Milwaukee, Wisconsin, such as Rib Mountain. The director of that service center has searched his records but has found no Form 2553 for Rib Mountain. Petitioner's case is not hopeless merely because respondent has not located *44 a copy of Form 2553 for Rib Mountain in his files. See Mitchell Offset Plate Service, Inc.,53 T.C. 235 (1969), in which this Court found, after reviewing the testimony of an attorney, accountant, and the sole shareholder, that Form 2553 had been filed although respondent could not locate it. The question before us is whether petitioner can prove, as did petitioner in Mitchell Offset, that there was a filing. Petitioner submits a carbon copy of Form 2553, dated January 2, 1967, as evidence of the original he, as president of Rib Mountain, allegedly filed on that date with respondent, charging that respondent has lost or mislaid that original. He states that he received four blank copies of the form from his accountant, James L. Gassner, that he and Gassner partially prepared a rough draft of that form in Gassner's office in Wausau, Wisconsin, in December of 1966, and that he then completed an original and two carbon copies in his home and mailed the original to respondent on January 2, 1967. Petitioner's statements concerning the preparation of Form 2553 are true, except in two respects, which are fatal to his case: one, the events described did not occur in *45 late 1966 and early 1967 but rather a year later, in late 1967 and early 1968; two, petitioner did not file Form 2553. Unfortunately for petitioner, Gassner did not begin active practice as an accountant until July 1967 in his office in Wausau. In light of this, petitioner's allegation that he conferred with Gassner in Gassner's office in December of 1966 is simply not true. Gassner remembers the conference, but it occurred in December of 1967, not December of 1966. Petitioner has misstated the time of this conference with Gassner; he backdated the original and two carbon copies he prepared by an entire year; finally, he did not file Form 2553 although he prepared an original and two carbons. It is obvious why petitioner did all this. He misstated the time of his conference with Gassner and backdated the original and carbons because section 1372(c)(1) and section 1.1372-2(b), Income Tax Regs., required that election of Subchapter S status for any taxable year must occur during the first month of such taxable year or during the month preceding it. Petitioner undoubtedly wanted the losses that Rib Mountain sustained to pass through to him, but when he conferred with Gassner in December *46 of 1967 the time for filing Form 2553 for 1967 had long passed. Petitioner backdated the form to a proper date, [2] January 2, 1967. Obviously he did not file Form 2553 since, as we have said, the time for filing had long passed. Rather, he saved one of the carbons and now presents it to this Court as proof of proper filing. This Court is unwilling to accept a backdated carbon (of a form which was never filed) as proof of proper filing. Petitioner at no time contends that there was any preparation of Form 2553 except that which he contends occurred in late 1966 and early 1967 and which actually occurred in late 1967 and early 1968 (after the filing time for 1967 had passed). Accordingly, we hold that petitioner has failed to carry his burden of proving that there was a filing of Form 2553 for Rib Mountain for 1967. Since petitioner has failed his burden, we hold further that Rib Mountain has not properly elected Subchapter S status. Thus *47 petitioner may not deduct Rib Mountain's corporate losses on his 1967 individual return or carry back excess losses to 1964. The third issue is whether petitioner may deduct Rib Mountain's 1968 corporate losses on his 1968 individual return. Rib Mountain need not elect Subchapter S status for each taxable year. Had petitioner, as president of Rib Mountain, timely filed Form 2553 in 1967 it would have been effective for 1968. Petitioner at no time contends that he filed a separate election for 1968. Thus, if any election is to be valid for 1968, it must be the one petitioner alleges he filed in 1967. Since we have held that petitioner has failed to carry his burden of proving that Form 2553 was filed for Rib Mountain for 1967, the same holding is required for 1968. We therefore hold that Rib Mountain has not properly elected Subchapter S status for 1968; thus Rib Mountain's 1968 corporate losses may not pass through to offset petitioner's 1968 individual income. [3]
*48 Issue 4. Deduction for Worthless Stock
FINDINGS OF FACT Petitioner deducted $1,000 in both 1967 and 1968 for worthless stock in Dairyland Cold Storage, Inc. (hereinafter Dairyland), a corporation which, like Rib Mountain, stored cheese. Petitioner admitted during audit of his returns and reaffirmed at trial that his stock in Dairyland became worthless in 1959 or 1960 but that he did not take a loss then because he did not need one. Petitioner prepared financial statements for submission to the State of Wisconsin in September of 1962 and 1963, which included schedules listing petitioner's assets; neither included Dairyland stock as an asset. Dairyland's own tax returns indicate no business transactions from 1962 through 1968. Petitioner's Dairyland stock became worthless no later than 1959 or 1960. OPINION The fourth issue is whether petitioner is entitled to a loss deduction in 1967 and 1968 for worthless stock in Dairyland. During audit of petitioner's tax returns, he admitted that his stock in Dairyland became worthless in 1959 or 1960 but that he did not take a loss then because he did not need one. He reaffirmed this admission at trial. In addition, petitioner prepared *49 financial statements in 1962 and 1963 for the State of Wisconsin but did not list Dairyland stock as an asset. This is another indication that petitioner recognized the worthlessness of the stock in the late 1950's or early 1960's. Finally, Dairyland's own tax returns indicate no business transactions from 1962 through 1968. Accordingly, we find that petitioner's Dairyland stock became worthless no later than 1959 or 1960. The question is whether any loss for this worthless stock may be taken in 1967 and 1968. In 1959 and 1960, section 165(g) provided that if a security became worthless during the taxable year, the loss was to be treated as the loss from the sale or exchange of a capital asset. Section 1.165-5(c), Income Tax Regs., provided that the amount allowed as a deduction was subject to the limitations on capital losses described in section 1.165-1(c)(3), Income Tax Regs. This regulation, in turn, provided that a loss would be allowed only to the extent allowed in sections 1211 and 1212. Section 1212 provided that if a taxpayer had a net capital loss for any year, the amount of loss would be a shortterm capital loss in each of the five succeeding taxable years. Since the stock *50 became worthless no later than 1960 and since section 1212 imposed a five-year limitation on loss carryovers, we accordingly hold that petitioner may not deduct $1,000 in 1967 and 1968 for his worthless stock. Issue 5. Petitioner's Salary from Rib Mountain
FINDINGS OF FACT Petitioner did not report any salary from Rib Mountain on his 1967 individual return, although records of Rib Mountain, prepared by petitioner, indicate that he received $5,000 in salary in that year. Petitioner surrendered no stock in 1967 to otherwise account for the $5,000 he received, nor was Rib Mountain's capital stock account reduced in 1967 to indicate a return of capital. Petitioner received $5,000 in salary in 1967 from Rib Mountain. Petitioner reported $12,458.84 in 1968 as salary from Rib Mountain. After a study of Rib Mountain's records, respondent determined that he actually received an additional $1,621.38 in salary. Rib Mountain's capital stock account did not change in 1968. Furthermore, at no time in 1968 did petitioner surrender any of his stock in Rib Mountain. Petitioner received $14,080.22 in salary in 1968 from Rib Mountain. OPINION The fifth issue is whether petitioner received *51 $5,000 in salary from Rib Mountain in 1967 and $14,080.22 in 1968. He reported no salary from Rib Mountain in 1967, although records of Rib Mountain which he prepared indicate he received $5,000 in salary. Petitioner surrendered no stock in 1967 to otherwise account for the $5,000 received, nor was Rib Mountain's capital stock account reduced in 1967 to indicate a return of capital to petitioner. We find petitioner received $5,000 in salary in 1967 and accordingly hold that he must include this $5,000 in income for 1967. Petitioner reported $12,458.84 in 1968 as salary from Rib Mountain. After a study of Rib Mountain's records, respondent determined that petitioner actually received an additional $1,621.38 in salary, for a total of $14,080.22. Petitioner now contends that he received no salary in 1968, but rather that the full $14,080.22 was a return of capital. Rib Mountain's capital stock account remained constant throughout 1968; furthermore, petitioner did not surrender any stock during that year. While petitioner contends that the $14,080.22 was a return of capital, he has introduced no evidence to prove this. We hold that he has failed to meet his burden of proof. Welch v. Helvering,290 U.S. 111 (1933); *52 Rule 142(e), Tex Court Rules of Practice and Procedure. We find that petitioner received $14,080.22 in salary from Rib Mountain in 1968 and accordingly hold that he must include this amount in income in 1968. Issue 6. Binding of Respondent by his Agent's Informal Statements
FINDINGS OF FACT The Internal Revenue Service began an audit in 1969 of petitioner's 1968 individual return. William A. Lassow, a tax auditor in the Office Audit Section, was first assigned to the case. The case was later transferred to Kenneth L. Fischer (hereinafter Fischer), a revenue agent, who contacted petitioner and requested a meeting with him at Internal Revenue Service offices. Such a meeting occurred in mid-February 1970; it was the only meeting between Fischer and petitioner. Fischer told petitioner that it appeared a "no change report could be in order." A "no change report" is a recommendation by a revenue agent that no audit changes will be made; he stamps his work papers, indicating "No Change in Tax Liability" and then initials those papers. The agent's recommendation of "no change" is reviewed by his supervisor and the Review Section of the Internal Revenue Service. If the agent's recommendation *53 is accepted, the Review Section indicates on the file that a "no change letter" is to be sent to the taxpayer. The District Director sends this letter, on Internal Revenue stationery, to the taxpayer, indicating that no change is required in the tax reported and that the return is accepted as filed. During the meeting at which Fischer stated he thought a no change report could be in order, he may have also told petitioner that he would "recommend" that no changes be made. He did not provide petitioner with a written copy of a "no change report," since the audit of petitioner's 1968 return was not completed, nor did he give him a "no change letter," since agents such as Fischer are not authorized to issue "no change letters." Fischer left Wausau for reassignment in California in late February. After his meeting with petitioner but before he left for California, he prepared a handwritten memorandum informing his supervisor and the succeeding revenue agent as to the status of his audit of petitioner's 1968 return. The memorandum recommended no changes be made in the return for 1968, subject to a review of the petitioner's 1967 return, as actions that petitioner took in 1967 could have *54 affected the 1968 return and the amount of tax owing. Fischer did not give petitioner a copy of this memorandum. It contains only Fischer's initials; no signature appears at all. Revenue Agent Thomas Spaay (hereinafter Spaay) succeeded Fischer in March of 1970 in auditing petitioner's 1968 return. The case file contained the handwritten memorandum from Fischer. During his examination, Spaay requested that petitioner produce his 1967 return since it might affect the 1968 tax. Petitioner objected, stating that Fischer had recommended "no change" for 1968. Spaay then explained that actions taken in 1967 could affect the 1968 return. After reviewing petitioner's 1967 return, Spaay concluded that actions taken by petitioner in 1967 had, indeed, affected 1968. When Spaay told petitioner of his conclusion and requested further documents, petitioner kept insisting that Fischer had recommended "no change." Spaay then gave petitioner a copy of Fischer's memorandum since it showed that Fischer's determination of "no change" was tentative and that the 1967 return had to be reviewed before a "no change report" could be recommended. Petitioner thus only received a handwritten, interoffice memorandum, *55 tentatively suggesting "no change" subject to completion of audit. Petitioner never received a "no change report" or "no change letter" from Internal Revenue Service representatives for his 1967 or 1968 tax years. Spaay continued his audit, which eventually led to the deficiencies determined in this case. OPINION The sixth issue is whether respondent can assert a deficiency for 1968 because of a revenue agent's informal statements. Petitioner contends that Fischer, a revenue agent, gave him a "no change report" indicating no changes in the tax for 1968, that Fischer and petitioner discussed this report, and that respondent cannot assert a deficiency for 1968 because of the discussion and the report. Respondent contends that Fischer at most told petitioner that he would "recommend" no changes for 1968. Respondent further contends that Fischer did not give petitioner a "no change report" or any other document and that the only document Fischer ever prepared was an interoffice memorandum to his supervisor and the succeeding agent which indicated no changes for 1968, subject to a review of petitioner's 1967 return. He allegedly prepared this interoffice memorandum because he *56 was being transferred to California. Respondent finally contends that Spaay, Fischer's successor, merely gave petitioner a copy of Fischer's interoffice memorandum to show him that Fischer considered 1968 subject to a review of petitioner's 1967 return. We accept respondent's contentions and reject petitioner's. Thus it is within the framework of the facts presented by respondent, which we have found to be true, that we must decide whether there is any basis for petitioner's argument that respondent cannot assert a deficiency for 1968. Petitioner argues that respondent is bound by his agent's statements and actions. Spaay certainly never told petitioner anything which would bind respondent. Throughout his discussions with petitioner he made it clear that actions taken in 1967 could affect the 1968 tax. Indeed, when he gave petitioner a copy of Fischer's interoffice memorandum, it was specifically to show him that Fischer also considered the 1968 tax subject to a review of petitioner's 1967 return. Turning to Fischer, he gave petitioner no documents at all and so we are left only with his statements as the basis for binding respondent. Admittedly, he may have told petitioner that *57 he would recommend no changes for 1968. But see Homer A. Martin, Jr.,56 T.C. 1294 (1971), which effectively disposes of Fischer's statement as a basis for binding respondent. There taxpayers argued that certain inventory losses were deductible since a conferee revenue agent had allegedly allowed the deduction; petitioners were not informed of respondent's contrary conclusion until several months later. This Court rejected petitioners' argument as follows at page 1300: An argument to this effect was recently dealt with in Sampson v. Commissioner,444 F. 2d 530 (C.A. 6, 1971), affirming a Memorandum Opinion of this Court, where the taxpayer claimed medical expense and charitable deductions, as follows (p. 531): After disallowance of the deductions, the taxpayer husband met with a representative of the Appellate Division of the Internal Revenue Service in an attempt to settle his disputed tax liability. At this meeting an agreement was reached allowing all claimed deductions and taxpayer left the meeting with the understanding that a final settlement had been reached. However, the recommendations of the conferee of the Internal Revenue Service *58 were rejected by his superiors and there were no further settlement negotiations. Unfortunately, from the taxpayer's standpoint, an informal agreement such as was reached in this case is not binding and has no legal effect. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Cleveland Trust Company v. United States,421 F. 2d 475 (6th Cir. 1970); Country Gas Service v. United States,405 F. 2d 147 (1st Cir. 1969). We must follow the same rule here. In both Martin and Sampson, the taxpayers may have genuinely felt an agreement was reached. But in this case there was never more than a recommendation. A recommendation implies that a higher authority must approve a subordinate's findings. If a recommendation must first be approved, then logically no agreement has yet been reached. If taxpayers cannot prevail when they thought there was an agreement, surely they cannot prevail where there was no agreement, but at most a recommendation. See also Estate of Ella T. Meyer,58 T.C. 69, 70 (1972), which states that section 7121 "sets forth the exclusive procedure under which a final closing agreement *59 as to the tax liability of any person can be executed." Section 301.7121-1(d), Proced. & Admin. Regs., provided that closing agreements "shall be executed on forms prescribed by the Internal Revenue Service." Such an agreement must be signed by the taxpayer and approved by the Secretary or his delegate. 26 C.F.R. sec. 601.202. In this case, of course, the only document is Fischer's interoffice memorandum. Petitioner certainly did not sign it. Thus section 7121, which sets forth the exclusive remedy for executing a final closing agreement as to tax liability, is not applicable. Petitioner represented himself and the basis of his theory that respondent may not assert a deficiency for 1968 is not altogether clear. Up to this point we have discussed his theory as though it were based upon contract law. However, petitioner in his petition and upon brief also uses the word "estoppel." Even if the basis of his theory that respondent is bound is one of estoppel, our answer is the same. See James v. Cole, 64 T.C. - (Sept. 25, 1975). We accordingly hold that respondent may assert a deficiency for 1968 though Fischer may have told petitioner that he would *60 "recommend" no changes in tax for 1968. Issue 7. Negligence Penalties
FINDINGS OF FACT Respondent imposed a negligence penalty for 1967 because petitioner did not report the $5,000 he had received in salary from Rib Mountain. Petitioner himself prepared the records indicating he had received $5,000 in salary. Petitioner's failure to report the $5,000 salary in 1967 was due to negligence or intentional disregard of rules and regulations. Respondent, in his notice of deficiency, determined that petitioner in 1968 received $1,620.00 in income from West Street Cold Storage, Inc., $1,124.67 from the sale of jewelry, and that petitioner deducted $1,170.06 for school tuition for his daughter. These three amounts are the basis for the negligence penalty for 1968. Petitioner conceded in his petition that these adjustments were correct. Petitioner's actions were due to negligence or intentional disregard of rules and regulations for 1968. OPINION The seventh issue concerns imposition of negligence penalties for 1967 and 1968. Respondent imposed a negligence penalty for 1967 under section 6653(a) because petitioner did not report the $5,000 he received in salary from Rib Mountain. *61 Petitioner himself prepared the records which indicate he received $5,000 in salary. The burden of proof is on petitioner to show respondent's determination incorrect. LeRoy Jewelry Co.,36 T.C. 443, 445 (1961). He has not done so. We accordingly find that the failure to report the $5,000 salary in 1967 was due to negligence or intentional disregard of rules and regulations. Thus the imposition of the penalty under section 6653(a) for 1967 was correct. The negligence penalty for 1968 was imposed because petitioner did not report $1,620 he received in salary from West Street Cold Storage, Inc., or $1,124.67 he received from the sale of jewelry. In addition, the negligence penalty was imposed because petitioner deducted $1,170.06 for school tuition for his daughter. The petitioner has introduced no evidence contradicting the negligence determination for 1968. We accordingly find that there was negligence or intentional disregard of rules and regulations for 1968. Thus the imposition of the penalty under section 6653(a) for 1968 was correct. Decision will be entered for the respondent.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. There is a question whether January 2, 1967, was, in fact, a proper date since Rib Mountain changed its accounting period in 1967. However, for the purpose of this discussion we will assume that January 2, 1967, was proper. See note 3.↩
3. Since we have held that Rib Mountain did not properly elect Subchapter S status for 1967 or 1968, we need not reach two other issues. In one, the parties assumed the election had been made; the question was whether it was timely since Rib Mountain had changed its accounting period in 1967. See note 2. The other issue involved the amount of passive income that Rib Mountain had in 1967 and whether it would be sufficient to terminate a proper Subchapter S election. Section 1372↩.