**M. G. STOLLER, Magdalene Stoller, Kenneth M. Stoller and Ellsworth J. Stoller**

v.

**The UNITED STATES.[1]**

No. 468–58.

United States Court of Claims.
July 12, 1963.

G. Charles Scharfy, Toledo, Ohio, for plaintiffs.

J. Mitchell Reese, Trenton, N. J., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 45 to Wilson Cowen, a trial commissioner of this court, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed April 23, 1963. Plaintiffs failed to file a notice of intention to except to the commissioner's findings or recommendation within the time provided for doing so pursuant to Rule 46(a). On May 22, 1963, defendant filed a motion to adopt the commissioner's report, to which plaintiffs have also failed to file a response, the time for so doing pursuant to the Rules of the court having expired. The case has been submitted to the court on defendant's motion filed May 22, 1963. Since the court is in agreement with the findings and recommended conclusion of law of the trial commissioner, as hereinafter set forth, pursuant to Rules 46 (a) and 48, it hereby adopts the same as the basis for its judgment in this case.

1. It is stipulated that Kenneth M. Stoller and Ellsworth J. Stoller have no interest in the subject matter of the suit and are not proper parties.

Defendant's motion filed May 22, 1963, is allowed. Plaintiffs are therefore not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

M. G. Stoller and his wife brought this action to recover $41,477.20 of income taxes paid for the year 1950. Since Mrs. Stoller is a party only because of the filing of a joint tax return, M. G. Stoller will be hereinafter referred to as plaintiff. The claim for refund is based upon an alleged net operating loss from plaintiff's wholly owned business in 1951 that exceeded the 1950 income. Plaintiff seeks a carryback of the alleged loss to 1950.

In 1951 and for a number of years prior thereto, plaintiff, doing business under the name of Stoller Seed House and Elevator Company, was engaged in the seed and grain elevator business. In the spring of 1951, plaintiff had serious financial difficulties, and on May 2, 1951, he filed in the District Court for the Northern District of Ohio a petition seeking an arrangement under Chapter XI of the Bankruptcy Act. On May 7, 1951, a receiver was appointed. He took possession of plaintiff's property and managed the business for the remainder of the year. An arrangement was not consummated, however, and on April 15, 1952, plaintiff was adjudicated a bankrupt and a trustee in bankruptcy was appointed.

At the first meeting of plaintiff's creditors, held May 21, 1951, it was revealed to the Bankruptcy Court that plaintiff had converted and sold substantial quantities of grain, principally soybeans, that had been stored in his elevators by the owners of these commodities. Claims aggregating $290,216.44, which represented the value of the converted grain, were filed with the receiver. None of the claims was paid until 1953 when the assets of the bankrupt were liquidated and distributed. At that time, approximately 45 percent of the claims asserted by the owners of the stored commodities were paid to them.

Plaintiff's books of original entry, surrendered to the receiver pursuant to the order of the court, were lost during the bankruptcy proceedings. The receiver is deceased, and efforts to locate the books have proved fruitless. However, plaintiff's canceled checks, deposit slips, and bank statements from the four banks with which he did business were preserved and his claims for refund were prepared by his accountant on the basis of these records.

The evidence as a whole shows that the converted grain was sold by plaintiff before May 2, 1952, and that the proceeds of the sales were deposited in his personal bank accounts. The evidence also leads to the conclusion that the proceeds of the sales were included in his 1951 income tax return as a part of a total of $3,123,498.07 received from the sale of seed, feed, etc. In view of the loss of plaintiff's original books of entry, however, an accurate determination cannot be made of the quantity of converted grain which plaintiff sold in 1951 or the total proceeds thereof that were included in his 1951 income tax return as a part of sales.

In computing the claimed loss for 1951, plaintiff deducted the $290,216.94, representing the value of the converted commodities, as a part of the cost of goods sold. The proper treatment of this item is the principal issue in the case.

### I

The parties are in disagreement as to the correct accounting period to be considered in determining plaintiff's gain or loss for 1951. Plaintiff contends that the Stoller Seed House and Elevator Company continued in existence as a taxable entity throughout 1951 and that the entire calendar year should be utilized, whereas defendant maintains that only the period from January 1 to May 7, 1951, when the receiver was appointed, is relevant in determining whether plaintiff sustained a net operating loss.

While such events as the death of an individual taxpayer or the dissolution of a corporation may create a taxable period

of less than one year, the courts have held that the appointment of a receiver does not end one taxable year and begin another.

In In re Kepp Electric & Manufacturing Co., 98 F.Supp. 51 (D.Minn.1951), a debtor had assigned all his tax claims to the receiver. This, said the referee, put the receiver in the "same position as the debtor from the standpoint of a taxable entity." The court accepted the referee's report in full, saying that the "confirmed arrangement did not operate to create two taxable entities where before only one had existed * * *" Id. 98 F. Supp. at 53.

In In re Lister, 177 F.Supp. 372 (E.D. Va.1959), the question was whether the receiver should file a fiduciary return or a partnership return. Said the court:

"Clearly the return is properly filed on form 1065 [for partnerships] as, for this purpose, the partnership continues to exist. Certainly it is true that two taxable entities are not created under a Chapter XI proceeding, where before only one had existed."

In re Sussman, 289 F.2d 76 (3d Cir., 1961), is a recent case holding that the filing of a petition in bankruptcy does not start the running of a new taxable period. The taxpayer-debtor had filed a petition in bankruptcy on June 7, 1956. The business had a loss for that year. The trustee filed a claim for refund on the theory that ownership of the debtor's refund claim had passed to him along with the other assets. The refund was collected and the debtor was successful in getting the court to turn the money over to him and his wife. Noting that a carryback loss claim does not mature until the end of the taxable period in which the loss was sustained, the court said:

"It has already been stated that Sussman's taxable year was the calendar year. *There is no provision in law that bankruptcy terminates a taxable year.* Therefore, when Sussman filed his bankruptcy petition he had no 'right of action'

against the United States for the trustee to acquire * * *." Id. 289 F.2d at 77–78. [Emphasis added.]

The statute dealing with assessment and payment of taxes after bankruptcy proceedings begin (11 U.S.C. § 797) seems to point in the direction taken in the above cases. It provides:

"* * * all taxes which may be found to be owing to the United States * * * from a debtor * * * and all taxes which may become owing to the United States * * * from a receiver or trustee of a debtor or from a debtor in possession, shall be assessed against, may be collected from, and shall be paid by the debtor or the corporation organized or made use of for effectuating an arrangement under this chapter * * *."

Accordingly, it is concluded that plaintiff's gain or loss for 1951 should be computed on the basis of the entire calendar year.

## II

For many years prior to 1951, plaintiff had kept his business financial records and accounts on the basis of cash receipts and disbursements, taking into account inventories, and he reported income for Federal income tax purposes on that basis. Although the parties have agreed that plaintiff's gain or loss from the operation of his business for 1951 is to be computed by using this hybrid system of accounting, they disagree on the application of the system to specific items of income and expense for that year. Plaintiff has accrued not only purchases but operating expenses as well. On the other hand, he did not accrue sales on account. Defendant insists that sales on account be accrued but says that purchases may not be accrued under the method followed by plaintiff. Both parties agree that the treatment of accounts payable and receivable in 1951 must be consistent with plaintiff's handling of these accounts for the years prior to

1951. Unfortunately, the evidence with respect to the handling of accounts payable and receivable for these years is less than satisfactory.[2] However, there is very little leeway in the required treatment of these items where the taxpayer is on a cash basis method of accounting and his income is derived from the sale of goods.

Section 41 of the Internal Revenue Code of 1939, 26 U.S.C. (I.R.C.1939) § 41 (1952 ed.), required a method of accounting that clearly reflects income. The accrual method of accounting that clearly reflects income would, under the circumstances of this case, be the most accurate one. But the statutory mandate is not that the method be the most accurate, but only that it "clearly reflect" income. If a taxpayer's gross receipts are largely from sale of goods, obviously his income for any given year might not be clearly reflected by a pure cash basis method. This problem was anticipated by the 1939 Code, 26 U.S.C. (I.R.C.1939) § 22(c) (1952 ed.):

> "Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken * * * upon such basis as the Commissioner * * * may prescribe * * *."

The Commissioner's "opinion" as to when inventories are necessary is spelled out by Treas.Regs. 111, § 29.22(c)–1 (1943):

> "In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *"

Proper use of inventories of course contemplates a matching of a particular sale during the taxable year with the "purchase expense" attributable to that sale. If the taxpayer is on a cash receipts method of accounting and sells goods on account, there is a reduction of inventory but no corresponding increase in cash. Thus merely keeping inventories does not insure matching of sales and cost. However, a satisfactory solution is provided by Treas.Regs. 111, § 29.41–2 (1943):

> "* * * in any case in which it is necessary to use an inventory, no method of accounting *in regard to purchases and sales* will correctly reflect income except an accrual method." [Emphasis added.]

This regulation completes the picture. Thus, it seems clear plaintiff, a cash basis taxpayer,[3] is required to accrue both sales and purchases. The logical conclusion, however, is that the regulations "implicitly sanction concurrent use of the cash basis for all other items," Note, 65 Harv.L.Rev. 351, 352 (1951). This conception of accounting for Federal income tax purposes by taxpayers on a cash basis is nothing new. In fact, it has long been the hornbook rule for accountants.[4]

The principles laid down in the 1939 Code and the regulations issued pursuant thereto have been followed in computing (a) plaintiff's net income for 1951 as shown in finding 8, and (b) plaintiff's net income in the period from January 1 to May 7, 1951, as shown in finding 10.

While it may not be said that the courts were entirely in agreement on the limits of a combined cash and accrual method of accounting prior to the enact-

---

2. Plaintiff's accounting for 1949 and 1950 apparently satisfied the Internal Revenue Service because upon audit plaintiff was found to have overpaid his taxes for each year.

3. No one system of accounting—such as the accrual method—was imposed on all taxpayers by the 1939 Code. Treas. Regs. 111, § 29.41–3 (1943).

4. "The so-called cash basis of reporting income for federal income tax purposes, as governed by the law and the regulations, is really a mixed cash-accrual basis. If the sale of purchased or manufactured goods is a major source of income, recognition must be given to sales on account, purchases on account, and inventories." Finney and Miller, Principles of Accounting—Intermediate 19 (4th ed. 1951).

ment of the Internal Revenue Code of 1954, the use of the part cash, part accrual method was sanctioned in Glenn v. Kentucky Color & Chemical Co., 186 F.2d 975 (6th Cir., 1951).

## III

■ Plaintiff's right to recover stands or falls on his right to deduct from his 1951 earnings the sum of $290,216.94, which represented the value of commodities stored by his customers and sold by plaintiff without their knowledge or consent.

It is not entirely clear from the record whether all of the grain was sold by plaintiff in 1951, but the proceeds of the sales constituted income in whatever year received, James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246; Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833.

In James, the Supreme Court held that embezzled funds constituted income, expressly overruling Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752. Rutkin v. United States, supra, teaches that:

> "An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."

This principle was recently applied in Muldrow v. Commissioner, 38 T.C. 91. In that case, the petitioner, who owned and operated a licensed cotton warehouse, converted and sold 812 bales of cotton in 1955 and the court held that the proceeds were properly includible in his gross income that year.

■■ While it is clear that the proceeds of converted goods are properly included in gross income, this does not fully answer the question whether the value of the converted grain in the present case may be deducted as a part of the "cost of goods sold." The gist of plaintiff's argument is that the $290,000 is a purchase expense which must be matched against the proceeds from the sale of the grain in order to clearly reflect income. The question cannot be evaded by saying that a cash basis taxpayer can deduct only purchases that have been paid for during the year, because as has been pointed out above, the Internal Revenue Code of 1939 and the regulations issued thereunder require even cash basis taxpayers to accrue sales and purchases, when inventories are kept and the sale of goods is a significant source of income.

■ Nevertheless, the $290,000 is not deductible for the simple reason that plaintiff never "purchased" the grain in any ordinary or commercial sense of that word. Resort to Webster's or Black's is not necessary to show that "conversion" and "purchase" are not synonymous terms. Although plaintiff made no attempt to prove that he sold the grain with the prior consent or acquiescence of the owners, he did acknowledge the conversion after the commodities had been sold. However, neither such belated information nor the recognition of an obligation to repay the owners the value of the grain gave birth to a retroactively effective purchase by plaintiff from the owners. The requirements of a realistically applied revenue law are not met by such fictional purchases. A vendor usually has an opportunity to determine the terms of the sale and the acceptability of the proposed vendee. It is unlikely that the owners of the grain here would have consented to the sales had they known of plaintiff's financial difficulties.

Plaintiff relies chiefly on Hofferbert v. Anderson Oldsmobile, Inc., 197 F.2d 504 (4th Cir., 1952), holding that the amount paid for an automobile in excess of the OPA ceiling price was deductible by the dealer as a cost of goods sold expense. Plaintiff also cites United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), which held taxable all gains from an illicit liquor business. These cases are inapposite here, for in both the taxpayers actually purchased goods for resale and the issue was whether the full.

cost of the goods was deductible or whether there were policy reasons for denying part of the claimed deduction. There is a further distinction between the case at bar and Anderson Oldsmobile, supra. In Anderson there was a willing buyer *and* a willing seller. Here the owners of the converted grain were hardly willing sellers.

In City Ice Delivery Co. v. United States, 176 F.2d 347 (4th Cir., 1949), which was cited in Anderson, the Fourth Circuit emphasized the necessity for the taxpayer to prove that an actual sale was made to him before he may deduct the purchase price as a part of the cost of the goods sold. In that case, City Ice, which was a retailer of ice, was owned by four ice-producing companies, one of which was Wiggins Ice and Fuel Co. A "surplus" of ice was being produced and, in order to keep prices up, the directors of City Ice ordered their company to make payments to Wiggins Ice and Fuel Co. to discontinue the manufacture of ice. "Cost of goods sold" was unsuccessfully advanced by the taxpayer for deductibility of the payments made to Wiggins Ice and Fuel Co. In denying the taxpayer's contention, the court stated:

> "The contention that the Wiggins payments are deductible on the score of *cost* is fallacious, for it flies right in the face of economic reality, which is here controlling. The parties with which we are here primarily concerned are taxpayer and Wiggins; the transaction, a sale of ice. But as between these two parties, the transaction under the option was just the opposite of a sale —a non-sale; and, by the same token taxpayer was a non-buyer, Wiggins a non-seller. And *cost* here ordinarily indicates the price, or part of it, paid by the buyer to the seller as a consideration for the sale of goods.
>
> \* \* \* \* \* \*
>
> "To include, then, the Wiggins payments under the item of *cost* would be at best, in commercial practice, an anomalous misnomer."

Since plaintiff is not entitled to deduct the value of the converted grain as a part of his cost of sales in 1951, it follows that he had a net income for that year of $159,751.47 as shown in finding 8, and is not entitled to recover.