## A. L. Davis and Neva Davis, Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 3857–75.     Filed February 27, 1978.

*Melvin M. Engel* and *Rudy M. Groom*, for the petitioners.
*Charles N. Woodward*, for the respondent.

Goffe, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income, tax as follows:

| TYE Sept. 30— | Deficiency |
| --- | --- |
| 1968 | $382,081.98 |
| 1969 | 74,608.15 |
| 1970 | 68,721.09 |

Due to concessions, the issues for decision are:

(1) Whether petitioners may carry forward to a taxable year following a discharge in bankruptcy, net operating losses sustained prior to filing a petition for an arrangement under the Bankruptcy Act and net operating losses sustained while petitioner A. L. Davis was a debtor in possession in the

arrangement proceeding which arrangement proceeding was converted to a bankruptcy proceeding followed by a liquidation;

(2) Whether petitioner A. L. Davis realized income from his discharge in bankruptcy pursuant to section 1.61–12(b), Income Tax Regs.;

(3) If the losses may be carried forward, whether they constitute property subject to a reduction in basis required by section 1.1016–7, Income Tax Regs.; and,

(4) Whether petitioners are entitled to a business bad debt deduction for advances of $133,000 made to a corporation which became uncollectable during their taxable year ended September 30, 1970.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference.

A. L. Davis and his wife, Neva Davis, filed their joint Federal income tax returns for the taxable years ended September 30, 1968, September 30, 1969, and September 30, 1970, with the Internal Revenue Service Center, Austin, Tex. They resided in Houston, Tex., at the time of the filing of their petition.

For approximately 30 years, A. L. Davis and his wife, Neva Davis (petitioners), have owned and operated retail grocery stores. Petitioners first entered the retail grocery store business in 1945 by opening a small grocery store in Fort Worth, Tex. Between 1945 and 1947 petitioners purchased and sold several small grocery stores in the Fort Worth area. In 1947 they purchased a retail grocery store and established the name of A. L. Davis Food Stores. Petitioners purchased a second store in 1952. They continued to expand their business and by 1962 petitioners owned and operated 57 retail grocery stores. Petitioners were able to expand their business because their major suppliers extended payment on the merchandise they sold to petitioners on open account which was unsecured. Petitioners utilized the accrual method of accounting for all relevant years in issue.

Petitioners began to experience financial difficulties due to their rapid expansion. For each of the 3 years prior to the taxable year ended September 30, 1962, petitioners sustained net operating losses. Their trade accounts increased. The purchase of merchandise on open account increased which made it increas-

ingly difficult to pay short-term loans. As a result of these difficulties, petitioners (as A. L. Davis Food Stores and Handymarkets) filed for an arrangement on May 28, 1962, under section 322 of the Bankruptcy Act.[1] Mr. Davis was allowed to continue in possession of his property as debtor in possession and to operate the retail grocery stores.[2] Mr. Davis operated the stores until October 11, 1963. During the period that Mr. Davis operated the retail grocery stores as debtor in possession, losses were incurred as follows:

| Period | Loss |
|---|---|
| 5/28/62 to 9/30/62 | $58,003.72 |
| 10/1/62 to 9/30/63 | 580,630.86 |

The parties to the proceedings could not formulate a satisfactory arrangement. On October 11, 1963, Mr. Davis filed a Debtor's Abandonment of Proceedings for an Arrangement, Consent to Adjudication, Petition for Receiver. On the same day Mr. Davis was adjudicated a bankrupt. A receiver was appointed and operated Mr. Davis' business from October 11, 1963, to October 28, 1963. On October 28, 1963, a trustee was appointed to liquidate the business and satisfy the claims of petitioners' creditors. Mr. Davis was discharged of all debts and claims relating to the bankruptcy proceedings on December 2, 1963. The discharge included debts totaling $3,835,795.01 which were not satisfied from the bankruptcy estate. Immediately after their discharge petitioners owned their home (worth $35,000), furniture, a 1961 Oldsmobile automobile, clothing, jewelry (wedding rings), and a life insurance policy all of which were exempted from the jurisdiction of the bankruptcy proceedings.

In February 1964 petitioners again entered the grocery store business by purchasing a supermarket in a shopping center in Fort Worth, Tex. (Davis Foodway). The store was successful due to marketing techniques implemented by petitioners.[3] Petitioners had been conducting business in the new store for approximately 1 year when Mr. J. C. Pace offered to buy their store. Mr.

---

[1]Petitioners sustained a net operating loss from the retail grocery business in the amount of $1,961,225.47 for the period beginning Oct. 1, 1961, and ending May 27, 1962.

[2]All of the assets and properties of A. L. Davis Food Stores and Handymarkets were community property of petitioners.

[3]For the fiscal year ended Sept. 30, 1964, petitioners sustained a net operating loss in their business in the amount of $25,748.32. For the fiscal year ended Sept. 30, 1965, petitioners reported gross sales in the amount of $813,196.67 and a net profit of $31,081.08 from Davis Foodway in Fort Worth, Tex.

Pace was in the retail grocery business and had been a competitor of petitioners for several years. As result of Mr. Pace's offer, petitioners sold their store for $99,832.91. In addition petitioners entered into a 10-year covenant not to compete in the retail grocery business anywhere in the State of Texas with the exceptions of Houston, Tex. (100-mile radius), and El Paso, Tex. (100-mile radius). In consideration for entering into the covenant not to compete, petitioners received $300,000.

Following the sale of Davis Foodway, petitioners moved to Houston, Tex., and established a retail grocery store pursuant to the restrictions in their covenant not to compete with Mr. Pace. For the fiscal years ended September 30, petitioner reported the following amounts as gross sales and net profits from their Houston grocery store business:

| Year | Gross sales | Net profit |
|------|-------------|-----------|
| 1965 | $74,796.73 | $(8,142.99) |
| 1966 | 2,989,778.79 | 72,656.77 |
| 1967 | 5,508,754.38 | 244,148.40 |
| 1968 | 8,153,633.06 | 310,149.06 |

As a result of their successful operation in Houston, petitioners accumulated excess capital which they intended to invest in grocery stores. However, Mr. Davis decided to personally manage the excess capital rather than putting it into a savings account. During 1966, 1967, and 1968 petitioners made numerous advances to various companies and individuals. Petitioners purchased a significant number of short-term corporate obligations from GMAC, James Talcott, Inc., Ford Motor Co., Westinghouse Credit Corp., Montgomery Ward, and Sears Roebuck & Co. These obligations were purchased through either a bank or a broker. Petitioners also made advances to friends and relatives which included their brothers, nephew, and brother-in-law. In addition, petitioners lent money to J. P. Bowlin Co. (a.k.a. Bowlin Houston, Inc. and Aabbott Houston, Inc., hereinafter referred to as Bowlin). All of the advances to Bowlin during 1966, 1967, and 1968 were secured by accounts receivable of Bowlin. Bowlin was in the business of selling equipment to retail grocery stores and restaurants. Petitioners had known J. P. Bowlin for several years and had purchased equipment from him when they maintained grocery stores in Fort Worth, Tex. All of the advances which were secured by

Bowlin's accounts receivable were either repaid or exchanged for stock in Bowlin.

Petitioners continued to purchase equipment from Bowlin when they moved to Houston, Tex. It was during this time (September 1968) that petitioners acquired controlling interest in Bowlin and eventually became the sole shareholders of Bowlin. In July 1968, Mrs. Davis began to work full time at Bowlin to lend guidance to the management. Petitioners employed a certified public accountant to maintain the corporate books of Bowlin because they were taking over the operation of Bowlin. During this time (1968, 1969, and 1970) petitioners made advances to Bowlin which amounted to $246,000. These advances, unlike the prior advances, were unsecured demand notes.[4] Petitioners made these advances to expand the business and to add additional services to Bowlin's operation. Bowlin used the advances to purchase equipment and satisfy operating expenses of the business when it did not have sufficient funds to meet its obligations. The financial statements of Bowlin for its fiscal years ended April 30, 1969, through April 30, 1975, reflect the advances made by petitioners during 1968, 1969, and 1970 as liabilities. The financial statement for the fiscal year ended April 30, 1976, reflects the $246,000 liability as paid-in capital.

Petitioners were divorced in 1971. The property settlement agreement between petitioners awarded the stock and notes receivable from Bowlin to Mrs. Davis. At the time of the trial of the instant case, Mrs. Davis was preparing to sell her interest in Bowlin (now Aabbott Houston, Inc.) for the purchase price of $140,000. Under this proposed agreement, Mrs. Davis would retain the land and building which had a fair market value of $65,000 and an outstanding first mortgage of $23,000.

On their joint income tax return for the taxable year ended September 30, 1965, petitioners claimed the following net operating losses carried forward from the taxable years indicated:

---

[4] Petitioners neither demanded payment on the notes nor tried to enforce collection of the notes.

| TYE Sept. 30— | Amount |
|---|---|
| 1962 | $2,019,229.19 |
| 1963 | 580,630.86 |
| 1964 | 25,748.32 |

Of the amounts claimed, only $143,845.19 of the net operating loss for the taxable year ended September 30, 1962, was absorbed by the taxable income and appropriate adjustments for the taxable year ended September 30, 1965, leaving $1,875,384 of the net operating loss for the taxable year ended September 30, 1962, and all of the net operating losses for the taxable years ended September 30, 1963, and September 30, 1964, available in full to carry forward to the taxable year ended September 30, 1966.

On their joint income tax return for the taxable year ended September 30, 1966, petitioners claimed the following net operating losses carried forward from the taxable years indicated:

| TYE Sept. 30— | Amount |
|---|---|
| 1962 | $1,875,384.00 |
| 1963 | 580,630.86 |
| 1964 | 25,748.32 |

Of the amounts claimed only $145,394.26 of the net operating loss for the taxable year ended September 30, 1962, was absorbed by the adjusted gross income offset by personal exemptions for the taxable year ended September 30, 1966, leaving $1,729,989.74 of the net operating loss for the taxable year ended September 30, 1962, and all of the net operating losses for the taxable years ended September 30, 1963, and September 30, 1964, available in full to carry forward to the taxable year ended September 30, 1967.

On their joint income tax return for the taxable year ended September 30, 1967, petitioners claimed the following net operating losses carried forward from the taxable years indicated:

| TYE Sept. 30— | Amount |
|---|---|
| 1962 | $1,729,989.74 |
| 1963 | 580,630.86 |
| 1964 | 25,748.32 |

Of the amounts claimed only $330,542.96 of the net operating

loss for the taxable year ended September 30, 1962, was absorbed by the adjusted gross income for the taxable year ended September 30, 1967, and carryover of the remaining $1,399,446.78 of the net operating loss for the taxable year ended September 30, 1962, expired on September 30, 1967. The net operating losses for the taxable years ended September 30, 1963, and September 30, 1964, remained available in full to carry forward to the taxable year ended September 30, 1968.

On their joint income tax return for the taxable year ended September 30, 1968, petitioners claimed the following net operating losses carried forward from the taxable years indicated:

| TYE Sept. 30— | Amount |
|---|---|
| 1963 | $580,630.86 |
| 1964 | 25,748.32 |

Of the amounts claimed only $579,644.36 of the net operating loss for the taxable year ended September 30, 1963, was absorbed by the adjusted gross income and adjustment for capital gain for the taxable year ended September 30, 1968, and carryover of the remaining $986.50 of the net operating loss for the taxable year ended September 30, 1963, expired on September 30, 1968. The net operating loss for the taxable year ended September 30, 1964, remained available in full to carry forward to the taxable year ended September 30, 1969.

On their joint income tax return for the taxable year ended September 30, 1969, petitioners claimed the entire net operating loss of $25,748.32 for the taxable year ended September 30, 1964.

On their joint income tax returns for the taxable years ended September 30, 1965, through September 30, 1970, petitioners did not claim any net operating losses sustained by the receiver in bankruptcy.

On their joint income tax return for the taxable year ended September 30, 1969, petitioners claimed the benefits of income averaging and they claimed an investment credit carried over from the taxable years indicated:

| *TYE Sept. 30—* | *Amount* |
|---|---|
| 1965 | $3,581.06 |
| 1966 | 5,238.14 |
| 1967 | 2,934.91 |
| 1968 | 876.15 |
| | $12,630.26 |

On their joint income tax return for the taxable year ended September 30, 1970, petitioners claimed as a miscellaneous loss from Bowlin Houston, Inc., the sum of $133,000.

In his statutory notice of deficiency, the Commissioner made the following determination (and others not here contested and, therefore, not enumerated):

It is determined that for the purpose of computing investment credit carryover to years beginning after September 30, 1967, and for the purpose of income averaging in the years ended September 30, 1968, 1969, and 1970, net operating loss deductions claimed by you in the years ended September 30, 1965, 1966, and 1967, respectively, in the amounts of $117,126.85, $148,394.26, and $330,542.96 are not allowable deductions for the reasons that such losses did not pass to you from the trustee-in-bankruptcy. In the event such losses are found to have passed to you from the trustee-in-bankruptcy then it is determined that you realized income from discharge in bankruptcy of your indebtedness which income offsets such losses. In the alternative if such losses are found to have passed to you from the trustee-in-bankruptcy then it is determined that they are property the basis in which must be reduced under Regulations 1.1016–7.

\*     \*     \*     \*     \*     \*     \*

It is determined that you are not entitled to net operating loss deductions claimed by you in the years ended September 30, 1968 and 1969, respectively, in the amounts of $569,878.78 and $25,748.32 for the reason that such losses did not pass to you from the trustee-in-bankruptcy. In the event such losses are found to have passed to you from the trustee-in-bankruptcy then it is determined that you realized income from discharge in bankruptcy of your indebtedness which income offsets such losses. In the alternative if such losses are found to have passed to you from the trustee-in-bankruptcy, then it is determined that they are property the basis in which must be reduced under Regulations 1.1016.7.

\*     \*     \*     \*     \*     \*     \*

It is determined that the $133,000 loss claimed by you in the year ended September 30, 1970 from Bowlin Houston, Inc. is not allowable for the reason that you have not shown that a loss occurred that year. In the event it is determined that advances made by you to Bowlin Houston, Inc., constituted loans then it is determined that you are not entitled to a bad debt deduction in the year ended September 30, 1970 for the reason that you have not shown that the debt became worthless that year. Should it be determined that a debt

existed which became worthless in the year ended September 30, 1970, it is determined that such debt is a non-business bad debt.

## OPINION

Petitioners' taxable years ended on September 30, 1968, 1969, and 1970 are before the Court. The correct tax liability for each of the taxable years ended September 30, 1968 and 1969 depends upon whether net operating losses sustained in prior years can be carried forward. The following table depicts taxable years and periods which bear upon the issues before the Court:

| Taxable year or period | Adjusted gross income or (net operating loss) | Sustained by |
|---|---|---|
| 1. 10/1/58 to 9/30/59 (TY) | Net operating loss[1] | Petitioners |
| 2. 10/1/59 to 9/30/60 (TY) | Net operating loss[1] | Petitioners |
| 3. 10/1/60 to 9/30/61 (TY) | Net operating loss[1] | Petitioners |
| 4. 10/1/61 to 5/27/62 (Period) | ($1,961,225.47) | Petitioners |
| Petition for arrangement under Bankruptcy Act filed 5/28/62 | | |
| 5. 5/28/62 to 9/30/62(Period) | ($58,003.72) | Petitioner as debtor in possession |
| 6. 10/1/62 to 9/30/63 (TY) | (580,630.86) | Petitioner as debtor in possession |
| Petitioner adjudicated a bankrupt and receiver appointed 10/11/63 | | |
| 7. 10/11/63 to 10/27/63 (Period) | [2]($2,695,417.31) | Receiver |
| Petitioner discharged from bankruptcy 12/2/63 | | |
| 8. 10/28/63 to 9/30/64 (Period) | ($25,748.32) | Petitioners |
| 9. 10/1/64 to 9/30/65 (TY) | 117,126.85 | Petitioners |
| 10. 10/1/65 to 9/30/66 (TY) | 148,394.26 | Petitioners |
| 11. 10/1/66 to 9/30/67 (TY) | 330,542.96 | Petitioners |
| 12. 10/1/67 to 9/30/68 (TY) | 569,878.78 | Petitioners |
| 13. 10/1/68 to 9/30/69 (TY) | 160,664.95 | Petitioners |
| 14. 10/1/69 to 9/30/70 (TY) | 6,264.23 | Petitioners |

[1] The parties stipulated that petitioners sustained net operating losses for these taxable years but not stipulate the amounts of the losses. The amounts are unimportant but the fact that net operating losses were sustained is important to show that losses sustained in subsequent taxable years could not be carried back but could only be carried forward.

[2] The loss sustained by the receiver in bankruptcy is not involved in this case.

On their return for the taxable year ended September 30, 1968, petitioners offset their entire adjusted gross income of $569,878.78 by a net operating loss sustained in the taxable year ended September 30, 1963 (line 6 in schedule above). The loss for that year could not be carried back to prior taxable years because the prior years were "loss" years and it could not be carried forward to the taxable years ended September 30, 1965, September 30, 1966, and September 30, 1967, because the income for those years was offset by a net operating loss for the taxable year ended September 30, 1962 (lines 4 and 5 in schedule above), which loss carryover expired on September 30, 1967.

On their return for the taxable year ended September 30, 1969, petitioners reported adjusted gross income of $160,664.95 and claimed as a deduction the net operating loss sustained for

the taxable year ended September 30, 1964, or $25,748.32. The net operating loss sustained in the taxable year ended September 30, 1963, expired on September 30, 1968. In addition, petitioners, on their return for the taxable year ended September 30, 1969, claimed the benefits of income averaging which required consideration of their taxable years ended September 30, 1965, September 30, 1966, September 30, 1967, and September 30, 1968, as base period years. Because of their application of the net operating losses as described above, they reported zero base period net income for such years. Petitioners also claimed an investment credit carryover to the taxable year ended September 30, 1969, of $12,630.26 for qualified investments made in their taxable years ended September 30, 1965, September 30, 1966, September 30, 1967, and September 30, 1968, which could not be utilized in any taxable year before the taxable year ended September 30, 1969, because the net operating losses claimed had eliminated tax liabilities for such years.

The Commissioner, in his statutory notice of deficiency, which can hardly be described as a model of clarity, disallowed the net operating loss deductions carried over to the taxable years ended September 30, 1968 and 1969 on the grounds that such losses did not pass to petitioners from the trustee in bankruptcy and that if they did pass to petitioners, that such losses were offset by the realization of income resulting from their discharge in bankruptcy. In addition, the Commissioner determined, in the alternative, that the losses were property, the basis of which must be reduced under section 1.1016.7, Income Tax Regs. Presumably, because of the chain reaction of the disallowance of the net operating loss carryovers, the Commissioner determined the tax liability for the taxable year ended September 30, 1969, without the benefit of income averaging because he apparently determined that by disallowing the losses carried forward to the base period years, no benefit would be derived from income averaging. He allowed no investment credit carryover to the taxable year ended September 30, 1969, presumably because the investment credits for the taxable years ended September 30, 1965, 1966, 1967, and 1968 were allowable in those years as he determined that tax liabilities existed for those years because the net operating losses carried over to those taxable years were not allowable. He allowed an investment credit in the taxable

year ended September 30, 1968, for the cost of qualified investment made in that year.

Although the statutory notice is sketchy, the parties appear to agree that the issues which produce the chain reaction effect on the taxable years before us are as follows:

(1) Are petitioners entitled to carry forward to a taxable year following a discharge in bankruptcy, net operating losses sustained prior to filing a petition for an arrangement under the Bankruptcy Act and net operating losses sustained while petitioner A. L. Davis was a debtor in possession in the arrangement proceeding which arrangement proceeding was converted to a bankruptcy proceeding followed by a liquidation?

(2) Did petitioner A. L. Davis realize income from his discharge in bankruptcy pursuant to section 1.61–12(b), Income Tax Regs.?

(3) If the losses may be carried forward, do they constitute property subject to a reduction in basis under section 1.1016–7, Income Tax Regs.?

The net operating losses sustained by petitioner prior to filing a petition for arrangement under the Bankruptcy Act and sustained by petitioner A. L. Davis as a debtor in possession in the arrangement proceeding arose from the operation of a retail grocery business conducted in the Fort Worth, Tex., area. Petitioners seek to carry them forward to offset profits subsequently derived from a retail grocery business conducted in Houston, Tex., and other income. Both businesses were proprietorships.

Respondent disallowed the carryover of the losses solely on the ground that the losses could not pass to petitioners through the intervening trustee in bankruptcy. If allowable, the losses may be deducted under section 172, I.R.C. 1954,[5] only in the years to which petitioners carried forward the losses as earlier taxable years were also loss years.

Two different and distinct net operating losses are involved; i.e., that loss sustained by petitioners before Mr. Davis filed his petition for an arrangement (October 1, 1961, to May 27, 1962— $1,961,225.47), and the losses sustained by Mr. Davis while a debtor in possession (May 28, 1962, to September 30, 1962—

---

[5] All Code references are to the Internal Revenue Code of 1954, as amended.

$58,003.72 and October 1, 1962, to September 30, 1963—$580,630.86). Because the losses are different, we will discuss them separately and chronologically.

### Loss Sustained Prior to Petition for Arrangement

The net operating loss sustained by petitioners in their retail grocery business for their taxable year commencing on October 1, 1961, until the date Mr. Davis filed his petition for an arrangement under the Bankruptcy Act was $1,961,225.47. Respondent first argues that because petitioners were on the accrual method of accounting, the net operating loss sustained for the period October 1, 1961, to May 27, 1962, was sustained only in the accounting sense and not economically because the liabilities accrued which gave rise to the loss never were paid by petitioner but were, instead, economic losses sustained by Mr. Davis' creditors.

This argument has no merit. Petitioners were required to use the accrual method of accounting because the sale of their inventory of merchandise was an income producing factor of their retail grocery business. Secs. 1.446–1(c)(2)(i) and 1.471–1, Income Tax Regs. Respondent has not challenged the right of petitioners to use the accrual method of accounting. Respondent cites no authority for the proposition that net operating losses cannot be carried forward by an accrual basis taxpayer unless the losses are sustained in an economic sense rather than an accounting sense. Nor have we found such authority. Nor are we willing to so hold. Neither the Code nor the regulations limits net operating loss deductions of accrual basis taxpayers. An accrual basis taxpayer is allowed deductions based upon accruability, not payment.

The Commissioner's primary position is that when Mr. Davis filed his petition for an arrangement he became a trustee for his creditors and when the arrangement proceeding was converted to a liquidating bankruptcy the title of the trustee in bankruptcy related back to the date of filing the petition for an arrangement. Because the net operating loss accrued up to that date represented property, in respondent's view, title vested in the trustee and petitioners may not carry forward the loss to their subsequent taxable years.

Both parties cite *Segal v. Rochelle*, 382 U.S. 375 (1966), for various propositions, yet neither party provides an extensive

analysis of this significant case which is warranted here. The facts were not complicated. The taxpayers-partners filed voluntary petitions in bankruptcy during a taxable year in which they were sustaining a net operating loss. The net operating loss could be carried back to profit years to produce a refund of income tax. The question presented was whether the trustee in bankruptcy or the bankrupt taxpayers were entitled to the claim for refund. At the outset of analysis of the case it is vital to a full understanding of the opinion to emphasize that the question was the ownership of the *claim for refund* resulting from the net operating loss carryback, not the proper party entitled to utilize the net operating loss carryback. The case arose in the Fifth Circuit which held that the claim for refund constituted property, the title to which vested in the trustee in bankruptcy upon the filing of the voluntary petitions in bankruptcy. The First Circuit held in *Fournier v. Rosenblum,* 318 F.2d 525 (1st Cir. 1963), that because a net operating loss could be carried back only after the close of a taxable year and the petition in bankruptcy was filed before that date, the claim for refund based upon the net operating loss carryback was too tenuous to be classified as property to which title could vest in the trustee in bankruptcy. The Third Circuit had held likewise in *In re Sussman,* 289 F.2d 76 (1961), but had also held that a claim for refund was inchoate and, because it could not be assigned under the statute which prohibited assignment of claims against the United States (31 U.S.C. sec. 203), it could not be transferred to the trustee in bankruptcy upon the filing of a voluntary petition in bankruptcy.

The Supreme Court held that the claim for refund, based upon the net operating loss carryback, constituted property and because it was transferable by the taxpayers, title to the claim for refund vested in the trustee in bankruptcy upon the filing of voluntary petitions in bankruptcy. The Court, however, distinguished a carryover from a claim for refund based on a carryback as follows:

> We are told that if this loss-carryback refund claim is "property," that label must also attach to loss-carryovers, that is, the application of pre-bankruptcy losses to earnings in future years. Since losses may be carried forward five years and in some cases even seven or ten years, I.R.C. secs. 172(b)(1)(B)–(D), great hardship for the estate is foreseen by petitioners in keeping it open for this length of time. While in fact the trustee can obviate this detriment to the estate—by selling a contingent claim in some instances or simply forgoing it—

inconvenience and hindrance might be caused for the bankrupt individual. Without ruling in any way on a question not before us, it is enough to say that a carryover into post-bankruptcy years can be distinguished conceptually as well as practically. The bankrupts in this case had both prior net income and a net loss when their petitions were filed and apparently would have deserved an immediate refund had their tax year terminated on that date; by contrast, the supposed loss-carryover would still need to be matched in some future year by earnings, earnings that might never eventuate at all. [382 U.S. at 381.]

If the steps in logic applied by the Supreme Court are scrutinized and compared to a net operating loss carryover, it is apparent that the net operating loss carryover cannot constitute property and is not transferable to the trustee in bankruptcy. In the instant case there could be no claim for refund because the net operating loss could not be carried back; petitioners sustained net operating losses and paid no tax for the 3 prior taxable years.

The Supreme Court first examined the question of whether the claim for refund constituted property. Section 70a(5) of the Bankruptcy Act vests in the trustee in bankruptcy title to all property owned by the bankrupt on the date of filing the petition in bankruptcy. Wages earned by a bankrupt after the date of filing the petition belong to the bankrupt, not the trustee, as do bequests and gifts intended for the bankrupt but not vested in him when the petition is filed. Nevertheless "property" has been construed in this context to include contingent rights or property, the enjoyment of which is postponed; i.e., contingent postponed interest in a trust and limited interest in future profits of a joint venture.

The Court pointed out the conflicting purposes of the Bankruptcy Act; i.e., (1) to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition; and, (2) leave the bankrupt free after the date of his petition to accumulate new wealth in the future. It demonstrated the prominence and relevancy of the second purpose by the following language:

Turning to the *loss-carryback refund claim* in this case, we believe it is sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as property under sec. 70a(5). [382 U.S. at 380; emphasis added.]

By contrast the net operating loss carryover is, to use the Supreme Court's language, greatly "entangled with the bankrupt's ability to make [a] * * * fresh start."

The loss carryover in the instant case is vastly different from the refund claim based on the carryback in *Segal v. Rochelle*, 382 U.S. 375 (1966). The loss carryover could produce nothing for the creditors. The receiver in bankruptcy sustained additional operating and liquidating losses aggregating $2,695,417.31. The question in the instant case is not who gets the benefit of the loss carryover but whether it can be utilized at all; only petitioners could gain any benefit by using it to offset profits subsequently earned. If not available to petitioners, the loss carryover would expire. In fact, $1,399,446.78 of the loss for the entire taxable year ended September 30, 1962 ($2,019,229.19), did expire on September 30, 1967. Petitioners seek to utilize the net operating loss carryover against profits earned from the identical kind of business which produced the loss; i.e., the retail grocery business. Respondent makes no objection to the carryover of losses from one grocery business to offset against profits of another grocery business.

The Supreme Court enumerated two key elements which pointed toward realization of a refund of tax which existed when the petition in bankruptcy was filed: (1) Taxes were paid within 3 years; and, (2) the year in which the petition in bankruptcy was filed exhibited a net operating loss at the time of filing. In the instant case, element number 1 is missing. No taxes have been paid which can produce a refund so there is nothing of value for the creditors.

The Segals argued that a refund could not be claimed until the close of the loss year and the petition in bankruptcy was filed before that date, thus no property right existed on the date the petition was filed. The Supreme Court pointed out that postponement of enjoyment did not disqualify an interest as property. The Segals also argued that earnings in the remainder of the loss year might diminish the net operating loss and the claim for refund. The Supreme Court rejected this argument by holding that the possibility of profits might produce a qualification of the property right but that a contingency in the abstract was no bar and the actual risk of the net operating loss being absorbed by profits earned during the remainder of the taxable year was far from a certainty.

The Supreme Court noted that passing the claim for refund to the trustee would not hinder the bankrupt from starting with a clean slate because the administrative inconvenience of the

bankruptcy proceeding would not be prolonged and the bankrupt, without a refund claim to preserve, would have more reason to earn income rather than less reason. Those justifications likewise apply here if petitioners are entitled to carry over the net operating losses to their return. If the loss carryover vested in the trustee in bankruptcy he might be encouraged to prolong administration of the bankruptcy estate in the vain hope of earning a profit to be offset by the net operating loss carryover. It is a fact of life that taxable profits are seldom realized in the liquidation of a bankrupt estate. The loss on liquidation in the instant case was mammoth and the loss carryover could not, therefore, be utilized by the trustee. The second point, that of encouraging the bankrupt to earn more after discharge, also coincides with permitting the loss carryover to go to the bankrupt. He can never realize any benefit from the loss carryover unless he earns a profit, and the more he earns the more he can retain before the net operating loss carryover expires, as $1,399,446.78 of the loss expired in this case.

The second requirement which had to be decided in *Segal v. Rochelle,* was whether the claim for refund was transferable. Section 70a(5) of the Bankruptcy Act (11 U.S.C. sec. 110(a)(5)), the only section that could confer title to the claim for refund upon the trustee, vests title in the trustee in bankruptcy only to—

property, including rights of action, which prior to the filing of the petition he [the bankrupt] could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered * * *

The Supreme Court concluded that a claim for refund based upon a net operating loss carryback was transferable by the bankrupt. We conclude that a net operating loss carryover of an individual taxpayer is not transferable. We are unable to find any authority permitting a taxpayer to deduct a net operating loss carryover assigned to him or it by another individual taxpayer. Even section 351 of the Code which permits tax-free transfers of property to a controlled corporation requires that the property transferred have value. See *Meyer v. United States,* 129 Ct. Cl. 214, 121 F. Supp. 898 (1954), cert. denied, 348 U.S. 929 (1955), where the Court held that no exchange took place within the meaning of section 351 where worthless stock was transferred to a controlled corporation. The value of a net operating

loss carryover is so speculative it could have no ascertainable value at the time of transfer. Our view that no general rule recognizes the transfer of a net operating loss carryover by an individual taxpayer is supported by the specific provisions whereby the loss on the stock of a small business investment company shall be treated as an ordinary loss which, for purposes of the net operating loss deduction, shall be treated as attributable to a trade or business of the individual taxpayer (sec. 1242) and whereby unused net operating losses of an estate or trust, upon termination, may be utilized by the beneficiaries (sec. 642(h)). We have held that a trustee in bankruptcy is not a trustee for purposes of section 642(h), *Mueller v. Commissioner*, 60 T.C. 36 (1973), affd. on this issue and revd. and remanded on other issues 496 F.2d 899 (5th Cir. 1974).

We recognize that net operating losses of corporations may be transferred and absorbed by successor corporations under limited circumstances (secs. 269, 381, and 382), but Congress has not seen fit to provide for the transfers of net operating losses by or to individuals.

Having concluded that the net operating loss sustained by petitioners prior to filing the petition for an arrangement under the Bankruptcy Act was not "property" within the meaning of that Act and was not transferable within the meaning of that Act, the net operating loss of $1,961,225.47 never left the possession of petitioners and they are entitled to carry it forward.[6]

### Losses Sustained as Debtor in Possession

The next losses to be considered are those sustained by Mr. Davis while a debtor in possession during the arrangement proceeding (May 28, 1962, to September 30, 1962—$58,003.72 and October 1, 1962, to September 30, 1963—$580,630.86).

Respondent takes the position that where an arrangement proceeding under the Bankruptcy Act is converted to a liquidating bankruptcy the title of the trustee in bankruptcy relates back to the date of filing the petition for the arrange-

---

[6]We recognize that there is language in *Bloomfield v. Commissioner*, 52 T.C. 745 (1969), and *Bloomfield v. Commissioner*, 54 T.C. 554 (1970), which is inconsistent with the result we reach on this issue. The language in those opinions is dicta because net operating loss carrybacks and resulting claims for refund were involved which came within the scope of *Segal v. Rochelle*, 382 U.S. 375 (1966). These cases are, therefore, distinguishable.

ment and losses incurred during the intervening period while the bankrupt is a debtor in possession are losses of the bankrupt estate, not losses of the bankrupt. Respondent's theory is based upon the concept that because the liquidating bankruptcy is a separate taxable entity and title to all of the bankrupt's assets relates back to the filing of the petition for an arrangement, the taxable entity of the bankruptcy estate comes into existence nunc pro tunc; i.e., on the date the petitioner filed his petition for an arrangement.

Respondent's position is contrary to the case law and is not supported by the facts. For the losses sustained by Mr. Davis as a debtor in possession to be treated as losses of the trustee, petitioners' taxable year must terminate when Mr. Davis filed his petition for an arrangement and the losses must be transferred to the entity of the trustee in bankruptcy. Filing a voluntary petition in bankruptcy does not, as a matter of law, terminate the taxable year of the debtor. *Martin v. Commissioner*, 56 T.C. 1294, 1299 (1971). Factually, petitioners' taxable year was not terminated. Petitioners filed a joint income tax return for the entire taxable year ended September 30, 1962, and a joint return for the taxable year ended September 30, 1963. Respondent has not challenged the correctness of those returns nor has he determined that they should have been filed by the trustee in bankruptcy who was subsequently appointed.

When the arrangement proceeding terminated and the trustee in bankruptcy was appointed to liquidate the bankrupt estate, the trustee began his accounting period which he rendered to the Court. He did not include in his accounting period the period during which Mr. Davis was a debtor in possession. Under respondent's theory if the taxable periods chargeable to the trustee include the periods Mr. Davis was a debtor in possession, the trustee would be responsible for income tax returns for taxable periods for which returns were filed by petitioners. This would create an administrative headache for the Commissioner as well as taxpayers. If the taxable periods of a debtor in possession somehow become those of the trustee, the trustee could hardly be charged with any responsibility for such returns prepared by petitioners. Under our system of self-assessment the person who is responsible for filing the return is accountable for its contents. Factually, therefore, respondent's position is untenable; i.e., the losses sustained by Mr. Davis while a debtor

in possession were reported by petitioners on their returns and were not claimed by the trustee in bankruptcy on returns he subsequently filed for later taxable periods. Therefore, only petitioners have claimed the benefits of the net operating loss carryovers.

Respondent's position not being supported factually, he must rely on a holding that the taxable periods of Mr. Davis as a debtor in possession are somehow deemed to be those of the trustee as a matter of law. This is contrary to *Stoller v. United States*, 162 Ct. Cl. 839, 320 F.2d 340 (1963), on which we relied in *CHM Co. v. Commissioner*, 68 T.C. 31 (1977), on appeal (D.C. Cir., Oct. 11, 1977; 9th Cir., Oct. 11, 1977). We continue to adhere to our position that filing a petition for an arrangement under the Bankruptcy Act does not terminate the taxable year of the debtor nor does it create a new taxable entity. *CHM Co. v. Commissioner, supra; In re Lister*, 177 F. Supp. 372 (E.D. Va. 1959); *Kanna v. United States*, an unreported case (D. Ore. 1975, 35 AFTR 2d 75–1482, 75–1 USTC par. 9450); *In re Kepp Electric & Manufacturing Co.*, 98 F.Supp. 51 (D. Minn. 1951). See also *Martin v. Commissioner*, 56 T.C. 1294 (1971).

As respondent points out and as we recognize, when an arrangement is converted to a liquidating bankruptcy, title to the bankrupt's assets vest in the trustee as of the date the petition for an arrangement was filed and such date also governs as the period of administration for purposes of determination of priority of claims. *United States v. Sampsell*, 193 F.2d 154 (9th Cir. 1951); sec. 302 of the Bankruptcy Act (11 U.S.C. sec. 702). The purpose of such a holding is, however, to protect creditors and those who suffer losses during administration of the bankrupt estate. To hold here that the taxable periods of a debtor in possession become severed from petitioners and, instead, become taxable periods of the trustee would aid no creditor, nor would it confer a benefit on the trustee in this case; it would merely deny to petitioners the right to carry over losses they sustained. Such an objective can scarcely justify overruling the cases cited above. Nor does *Mueller v. Commissioner*, 60 T.C. 36 (1973), affd. in part, revd. and remanded in part (5th Cir. 1974), support respondent's theory. The taxpayer in that case was on the cash method of accounting and the losses involved were sustained by the trustee in bankruptcy. The taxpayer sought to carry the losses back to years in which he

filed returns under the theory that he was a beneficiary of the bankrupt estate within the meaning of section 642(h) of the Code. We held that a bankrupt estate was not an estate or trust within the meaning of section 642(h), nor was the bankrupt taxpayer a beneficiary within the meaning of that section.

Our analysis of whether the trustee acquires title to net operating loss carryovers sustained prior to the petition for an arrangement likewise applies here. The trustee acquires no title to net operating losses sustained by petitioners while a debtor in possession.

### *Income Realized from Discharge in Bankruptcy.*

Respondent also attacks the right of petitioners to carry over both the net operating losses sustained prior to the arrangement and those sustained while Mr. Davis was a debtor in possession on the grounds that such losses were absorbed by income realized by Mr. Davis when he was discharged from bankruptcy on December 3, 1963, as a result of cancellation of indebtedness. Respondent never attempted to calculate the amount of income realized which, of itself, casts doubt upon the existence of such income.

Section 1.61–12(a) and (b), Income Tax Regs., provides in part:

(a) * * * The discharge of indebtedness, in whole or in part, may result in the realization of income. * * *

(b) * * * Income is not realized by a taxpayer by virtue of a discharge, under section 14 of the Bankruptcy Act (11 U.S.C. 32), of his indebtedness as a result of adjudication in bankruptcy, or by virtue of an agreement among his creditors not consummated under provisions of the Bankruptcy Act, if immediately thereafter the taxpayer's liabilities exceed the value of his assets. * * *

Respondent argues that Mr. Davis emerged from the bankruptcy proceedings with an excess of assets over liabilities resulting in income from the discharge of indebtedness. The assets which Mr. Davis received upon discharge from bankruptcy were petitioners' homestead, a 1961 Oldsmobile automobile, clothing, jewelry, and an insurance policy on the life of Mr. Davis. All of this property was exempt from the claims of creditors by operation of law. Tex. Const. Ann. art. 16, sec. 49, 50 (Vernon); Tex. Civ. Stat. arts. 3832, 3832(a) (Vernon 1966), repealed effective January 1, 1974; *Hickman v. Hickman,* 149 Tex. 439, 234 S.W. 2d 410 (1950). Assets exempt from the claims of

creditors are not considered in a determination of whether a bankrupt is solvent following a discharge in bankruptcy. *Cole v. Commissioner*, 42 B.T.A. 1110 (1940).[7]

When a debtor-taxpayer is solvent after discharge in bankruptcy, income is realized only to the extent of his solvency. *Brutsche v. Commissioner*, 65 T.C. 1034 (1976); *Texas Gas Distributing Co. v. Commissioner*, 3 T.C. 57 (1944); *Lakeland Grocery Co. v. Commissioner*, 36 B.T.A. 289 (1937).

Respondent argues that petitioners, in addition to the exempt property, owned an extremely valuable asset which was never valued in the bankruptcy proceedings, namely, petitioners' business expertise and established business relationship in the retail grocery business. Respondent further argues that this "asset" was encumbered prior to the discharge but upon discharge was "set free" to realize its full potential. There can be no question that Mr. Davis, as well as his wife, possessed great talent and expertise in the management of retail grocery stores in spite of their financial difficulties which led to bankruptcy. This is further established by their success in the grocery business following the discharge in bankruptcy. However, neither the Bankruptcy Act nor the Internal Revenue Code provides for the inclusion in the bankruptcy estate or the taxation of one's expert knowledge.

We know of no case which taxes a taxpayer's expertise or skill, nor has respondent cited any authority. The difficulties involved in placing a value on such an ethereal asset are insurmountable and would involve only conjecture. Such qualities could hardly constitute good will and it is doubtful that a bankrupt emerges from bankruptcy with much good will. Respondent conjures up no value but for some reason not illuminated to the Court, respondent concludes that the value must at least be equal to the net operating loss carryovers. This argument is nothing more than a spurious attempt to disallow the carryovers.

*Reduction in Basis Required by Section 1.1016–7, Income Tax Regs.*

Having decided that the net operating losses sustained by Mr.

---

[7]*Estate of Marcus v. Commissioner*, T.C. Memo. 1975–9.

Davis prior to filing his petition for an arrangement do not constitute property under the Bankruptcy Act, they likewise cannot constitute "property" requiring a reduction in basis under section 1.1016–7, Income Tax Regs. Apparently respondent concedes this theory. Although this ground was set forth in the statutory notice of deficiency, respondent does not argue the point on brief.

In his reply brief respondent for the first time and, therefore, apparently as an afterthought, makes a convoluted argument about the effects of Texas community property law on the loss carryovers. Such theory is well beyond the scope of the statutory notice and untimely. It will, therefore, not be considered. *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754 (1958).[8]

### *Advances to Bowlin*

The final issue for decision is whether petitioners are entitled to a business bad debt deduction in the amount of $133,000 for the taxable year ended September 30, 1970. Respondent takes the position that the advances made by petitioners to Bowlin in 1968, 1969, and 1970 constitute contributions to capital. Petitioners contend that the advances created a debtor-creditor relationship because the parties intended the advances to be debts and treated them as such.

The question of whether the advances made by petitioners to Bowlin are debt or equity depends on the economic substance of the transactions between them and not upon the form of the advances. *Gregory v. Helvering*, 293 U.S. 465 (1935). Various courts have utilized a list of factors to determine the characteristic differences between debt and equity. *Fin Hay Realty Co. v. United States*, 398 F.2d 694 (3d Cir. 1968).[9] We stated in *Litton Business Systems, Inc. v. Commissioner*, 61 T.C. 367, 376 (1973):

The difficulty lies in the variety of related factors enumerated by the various courts, the apparent unequal weight accorded in the application of different or even the same factors considered, and the distinction often drawn between merely "evidentiary" factors and "ultimately determinative" factors. [Fn. ref. ommitted.]

---

[8] *McDowell v. Commissioner*, T.C. Memo. 1974–72; *Astleford v. Commissioner*, T.C. Memo. 1974–184.
[9] *W. B. Killhour Sons, Inc. v. Commissioner*, T.C. Memo. 1973–183.

Therefore, it is necessary to look to cases decided by the Court of Appeals for the Fifth Circuit.[10]

In *Tyler v. Tomlinson*, 414 F.2d 844 (5th Cir. 1969), the court held that advances made by shareholders to the corporation were contributions to capital rather than debts. The court considered a number of factors which formed the basis of its decision. These factors included: (1) The financial viability of the corporation; (2) the manner in which the corporate debts are created; (3) the financial sources from which corporate repayment is to be anticipated; (4) the identity of interest between shareholder and creditor; and (5) sporadic payment of interest and principal or the complete absence of such payments.[11]

In the instant case petitioners made advances to Bowlin during 1968, 1969, and 1970 totaling $246,000. These advances were represented by unsecured demand notes. They were made for the purposes of meeting operating expenses and expansion of the business. All of the advances made by petitioners from 1968 to 1970 were made at a time when petitioners either controlled Bowlin or were the sole shareholders of Bowlin. Mr. Davis testified that due to the poor financial condition of Bowlin he foresaw the possibility that the advances would not be repaid. He further testified that this possibility was not as important as Bowlin becoming a profitable enterprise.

Due to the character of the notes (unsecured demand notes) the only source from which the advances might be repaid was from the future profits of Bowlin. See *Berkowitz v. United States*, 411 F.2d 818 (5th Cir. 1969). The fact that the notes required payment on demand cannot be considered in any realistic way as an expectation of repayment on the part of petitioners. Moreover, petitioners could not realistically expect repayment due to Bowlin's financial condition during 1968–70. A demand by petitioners for payment would have defeated Mr. Davis' primary concern (i.e., the future success of Bowlin). Under usual circumstances a creditor might resort to such action but the fact that petitioners actively managed Bowlin and were its controlling shareholders illustrates the lack of a dichotomy

---

[10]The appeal in the instant case lies in the Fifth Circuit.

[11]Eleven separate determining factors have been generally used by the courts in determining whether amounts advanced to a corporation constitute contributions to capital or debt. *Montclair, Inc. v. Commissioner*, 318 F.2d 38, 40 (5th Cir. 1963); *A.R. Lantz Co. v. United States*, 424 F.2d 1330 (9th Cir. 1970).

between debtor and creditor. In addition, petitioners' failure to require Bowlin to make interest payments indicates that petitioners "[were] not seriously expecting any substantial interest income, but [were] interested in the future earnings of the corporation or the increased market value of [their] interest." *Curry v. United States*, 396 F.2d 630, 634 (5th Cir. 1968), cert. denied 393 U.S. 967 (1968). For these reasons it is clear that the advances made by petitioners to Bowlin during 1968, 1969, and 1970 were contributions to capital and not loans. Accordingly, petitioners cannot deduct $133,000 for the taxable year ended September 30, 1970, as a business bad debt.

*Decision will be entered under Rule 155.*

